STATE OF CONNECTICUT *v.* SALVATORE ANNUNZIATO
ET AL.

WYNNE, C. J., BALDWIN, DALY, KING and MURPHY, JS.

Argued February 5—decided March 6, 1958

*Louis Feinmark,* for the appellant (named defendant).

*Alfonse C. Fasano,* for the appellant (defendant Miller).

*Arthur T. Gorman,* assistant state's attorney, with whom, on the brief, was *Abraham S. Ullman,* state's attorney, for the appellee (state).

DALY, J.  The defendants Annunziato and Miller and four other men were, on August 18, 1955, informed against in an information, filed in the Superior Court in New Haven County, charging them with having committed the crime of conspiracy in the town of Branford on or about July 23, 1955, and were arrested upon a bench warrant issued on August 18, 1955, by a judge of the Superior Court.  On January 5, 1956, a second count, charging breach of the peace, and a third count, alleging wilful injury to and destruction of personal property of others, were added to the information.  After a trial on the second and third counts, the court found Annunziato and Miller guilty on both of those counts.  Each of them has appealed from the judgment.

On July 23, 1955, the defendant Miller had been charged with the crime of aggravated assault, alleged to have been committed in the town of Branford on that date, and had been arrested by police officers of that town.  He had posted a bail bond and was awaiting trial in the town court of Branford at the time of his arrest upon the bench warrant issued on August 18, 1955.  Before the charge of aggravated assault was disposed of in the town court, and after Miller filed a motion for a more specific statement in the Superior Court, the state's attorney stated that he would add two counts to the information and would not press the count charging conspiracy.  The aggravated assault charged in the information upon which Miller was awaiting trial in the town court was the same assault as was alleged in the second count of the information filed in the Superior Court on January 5, 1956.  On January 6, Miller filed a plea to the jurisdiction challenging the jurisdiction of the Superior Court.  In and by his plea, he alleged that by a special act the Town Court of Branford, estab-

lished in 1897, had exclusive jurisdiction of the offenses alleged in the information to have been perpetrated by him. The special act provided that "[t]here is hereby established within and for the town of Branford a court, to be styled and called the Town Court of Branford, which shall have jurisdiction and cognizance of all crimes and misdemeanors committed within said town," and that "[s]aid town court shall have exclusive cognizance of and hear all complaints for criminal offenses committed within said town of Branford, which shall be brought before said town court." 12 Spec. Laws 955, No. 304, §§ 1, 2. The court overruled the plea to the jurisdiction. In his assignment of errors Miller alleged that the court erred in doing so.

In 1939, the General Assembly passed an act entitled "Minor Courts." General Statutes, Cum. Sup. 1939, §§ 1361e-1370e. In *Lake Garda Co.* v. *LeWitt*, 126 Conn. 588, 592, 593, 13 A.2d 510, we said: "It is apparent from a survey of that whole act that it was the intention of the Legislature to preserve merely the structure of the town, city and borough courts theretofore existing and to provide a new and uniform jurisdiction and practice and procedure for those courts. Section 1361e establishes the jurisdiction of such courts. There is no possibility of argument that any of these courts may still have any other limits of jurisdiction because the charter provision relating to them gives them such. . . . In short, so far as jurisdiction and practice and procedure in the town, city and borough courts is concerned, the slate is wiped clean and an entirely new order is set up."

Section 7579 of the General Statutes provides, as do § 2331c of the 1953 Cumulative Supplement and § 3096d of the 1955 Cumulative Supplement, that, in

any town, city, borough or district having a population of less than 15,000 as determined by the last federal census, "[a]ny municipal court having criminal jurisdiction shall have jurisdiction of all crimes and misdemeanors committed within the territorial limits of such town, city, borough or district . . . and shall have final jurisdiction, subject to appeal, of all crimes wherein the penalty provided shall not exceed a fine of two hundred and fifty dollars or imprisonment for six months or both," and that "[t]he jurisdiction provided for in section 8733 is conferred upon all municipal courts having criminal jurisdiction." The population of the town of Branford as determined by the last federal census was 10,944. Conn. Reg. & Manual, pp. 300, 301 (1957). The maximum penalty provided for conspiracy by § 8876 of the General Statutes, which was in effect on August 18, 1955, when the bench warrant ordering Miller's arrest for the alleged commission of that crime was issued, was a fine of $5000 or imprisonment of fifteen years or both. The maximum penalty for breach of the peace is a fine of $500 or imprisonment of one year or both. § 8518. The maximum penalty for wilful injury to or destruction of the personal property of another is a fine of $100 or imprisonment of six months or both. § 8463. Section 8733 provides that "[i]n a prosecution for any crime the punishment for which shall be a fine of not more than one thousand dollars or imprisonment for not more than five years or both, any municipal court may take final jurisdiction thereof, whenever, upon conviction, the court shall determine that no greater punishment ought to be imposed than that which it may lawfully inflict."

It will be noted that, like § 1361e of the 1939 Cumulative Supplement, a part of the original Minor

Courts Act, neither the applicable portion of § 3096d nor § 8733 provides that the municipal courts shall have exclusive jurisdiction. Furthermore, as provided by § 8743, "[t]he superior court shall also have concurrent jurisdiction of any offense which is within the jurisdiction . . . of any municipal court," and, as provided by § 8764, "[a]n original information may be filed in the superior court against any person accused of crime in any case in which an inferior court may, at its discretion, punish him or bind him over for trial, and in any other case upon the order of the superior court." The Superior Court had exclusive jurisdiction of the crime of conspiracy charged in the first count of the amended information. It had jurisdiction of the other offenses— breach of the peace and wilful injury to or destruction of property of another—alleged in the second and third counts, since exclusive jurisdiction of these crimes is not given to some other court. *State* v. *Chin Lung,* 106 Conn. 701, 719, 139 A. 91. The trial court did not err in overruling the defendant Miller's plea to the jurisdiction.

Each defendant contends that the court erred in finding certain facts which he asserts were found without evidence. These claims are futile. The challenged facts are amply justified by the evidence. Each of the defendants maintains, also, that the court erred in refusing to find certain other facts which he claims were admitted or undisputed. A fact is not an admitted or undisputed fact because the witness who testified to it has not been contradicted. The acceptance or rejection of testimony is a matter for the trial court. *Nixon* v. *Gniazdowski,* 145 Conn. 46, 48, 138 A.2d 796; Practice Book § 397. The finding, as made, must stand.

The court found the following facts: Double

Beach in the town of Branford is a summer resort consisting of beaches, bathhouses, refreshment stands, cottages, and a restaurant and bar known as the Double Beach House. The Double Beach House faces east with a large dining room in the southeasterly portion of the building, a bar in the northeasterly portion, and a kitchen immediately to the rear of both rooms. There is a large parking area north of the building. On July 23, 1955, Alfred Hansen and Jeff Davis, Sr., were the proprietors of the Double Beach House.

The defendant Annunziato had been at the Double Beach House with various persons two or three times during the week ending on Saturday, July 23, 1955. On those occasions his relationship with the proprietors and their employees had been amicable and free from trouble. During the early part of the afternoon of July 23, he had been at his home in East Haven with Michael Coppola and one Verderame. At about 3:30 p.m., Annunziato and Coppola arrived at the Double Beach House, having been driven there by Verderame. Upon entering the building, Annunziato and Coppola seated themselves at a table in the northeasterly corner of the barroom. They were served liquor and coffee at that table from time to time by a waitress. Shortly after 7 p.m., the night shift of waitresses relieved her and other waitresses in the barroom. At that time Annunziato became very loud and objectionable to other customers in the barroom. Then a small boy, who was with a party seated in the barroom, wandered over to Annunziato's table and Annunziato ordered a soft drink for him. The father of the boy recalled him to his table, whereupon Annunziato followed him and became abusive, using loud and insulting language. As a result, several patrons left the premises. Other

men present cautioned Annunziato relative to his language, causing further abusive outbursts on his part before he returned to his table.

Thereafter, Annunziato demanded service from a waitress who was not assigned to his location. Upon her delayed arrival, the waitress warned Annunziato that unless he ceased his abusive remarks she would report him or call the police, and words ensued between them. Following this disagreement, Annunziato remarked that he would have the waitress fired. She reported the matter to Hansen, who was unable to come immediately to the barroom. Ten or fifteen minutes later, following a second complaint by the waitress because of renewed objectionable conduct by Annunziato, Hansen came to the barroom and was immediately met by Annunziato, who left his table hurriedly, approached Hansen in a very rough manner and demanded, "Who the hell is that broad that's going to have me arrested?" Hansen attempted to quiet Annunziato and finally induced him to return to his table. None of these disagreements caused the proprietors or any employee to cut off the sale of alcoholic liquors to Annunziato, nor was he requested to leave. He had a discussion with Hansen, at the end of which the two men shook hands and invited each other to have a drink.

About fifteen minutes later Annunziato again left the table and went to the telephone booth, where he was seen to make three separate calls. Upon leaving the booth, he returned to his table and was overheard telling Coppola, "Don't worry, we'll have plenty of help soon." Approximately half an hour later, a group of shirt-sleeved men, eight to twelve in number, arrived at the parking lot in two automobiles, one owned by Louis Buonfiglio and the other by the defendant Miller. Hansen's attention was di-

rected to this group before their arrival at the building. He ran to the telephone in the kitchen and called the police, requesting immediate assistance. This action was taken because of what Hansen knew about Annunziato and because of Hansen's fear of trouble. While Hansen was engaged in telephone conversation with the police, the group of men led by Miller arrived at the front entrance to the barroom. Immediately thereafter, Miller and the others entered the room in single file, walked directly to Annunziato's table and spread out in a semicircle around him. Suddenly, without warning or any cause, the men in this group threw tables, chairs, bottles, dishes and glasses and struck various patrons seated in the barroom. One patron, James Hearon, received a blow from behind and was struck on the head with a chair and hit again while lying on the floor. He suffered a cut in his scalp requiring twenty-four stitches, a broken nose, a sprained ankle, twisted ligaments, ruptured blood vessels, an injured back and other bruises and lacerations, necessitating his absence from work for a period of six weeks. Another patron, while on the floor, was struck with various objects and kicked by the group of men. Annunziato came over to join the group but was told "not to be a fool and go back and sit down," which he did. Other patrons received severe injuries. Tables and glasses were broken and people were screaming. Annunziato left his table, picked up a table and threw it at a group of men some ten or twelve feet away. He also grabbed a bowling machine as if to throw it but was told not to be "a fool" and to go back to his table.

Damage to the interior of the barroom was extensive. Tables and chairs were broken; window frames, glass and screens were shattered; a juke box and a large standing fan were smashed; the plywood walls

were punctured and the floor strewn with a litter of broken bottles, glasses and dishes. There was blood on the floor. In addition, all the chairs and tables were turned over with the exception of two tables at the north end of the room. Annunziato and Coppola were at one of these. The other had been occupied by a group for whom Annunziato had purchased a round of drinks. As soon as the wrecking started, the patrons and occupants of the barroom, with the exception of Annunziato and Coppola, sought safety by leaving the premises or hiding in corners. Immediately after the wrecking, the group of men led by Miller left the building and returned to the parking area. As one of them walked past the easterly side of the building, he engaged in conversation through the window with Annunziato and Coppola, who had remained at their table. The participants in this conversation seemed to be laughing. The man who had talked with Annunziato and Coppola then ran to overtake the others and joined them in the parking area.

The group had just returned to the cars when the first Branford police officer arrived on the scene in response to Hansen's call. The officer endeavored to find out what the trouble was when one of the group informed him that there was someone in the barroom with a gun, whereupon the officer proceeded immediately to investigate. Before he left the group, he made a note of the registration numbers of the two cars, which were parked side by side, and instructed the drivers to remain there until his return. Upon entering the barroom the officer saw Annunziato and Coppola still seated at their table, with Annunziato bearing a cut on his hand and blood on his T-shirt. The officer also discovered two patrons badly in need of medical attention. After taking Annunziato and

Coppola into custody and turning them over to another officer, he transported the injured patrons to a doctor. Before the officer returned to the parking lot, both Miller and Buonfiglio had departed, with the other men of the group, in their cars. Later that evening the defendant Miller's wrist watch, with a cracked crystal and broken wristband, was found on the floor in the northeasterly part of the barroom. The police received the telephone call from Hansen asking for help at 8:25 p.m. The first officer arrived at the Double Beach House between 8:28 and 8:30 p.m.

Sometime before midnight and while the police were looking for him, the defendant Miller surrendered to the Branford police. He had been married about two years before and was living in Milford with his wife, who operated a beauty shop there. At the police station Miller was observed by the officers to have red, scraped knuckles on both hands. At no time did he ask the management at the Double Beach House or the police about his watch, which he knew he had lost. Miller and Annunziato were known to each other before July 23, 1955. Milford is about ten miles west of New Haven. The Double Beach House at Branford is about the same distance east of New Haven as Milford is west of it. There were no telephone calls from the Double Beach House to Milford after 1:16 p.m. on July 23. Such a call is a toll call. Calls may be made directly from Branford to New Haven, and they may be made directly from New Haven to Milford.

The court concluded that Annunziato, while at the Double Beach House on the evening of July 23, 1955, directed profane and abusive language to patrons and employees without cause or justification; that because of his inability to have a waitress discharged

or reprimanded after she had threatened his arrest, and for the further reason that owing to his behavior others were shunning him and leaving the premises, he became enraged and summoned a gang of men to aid him in inflicting substantial damage to the Double Beach House and its occupants; that in immediate response to the telephoned request of Annunziato, a group of men proceeded in two cars, belonging to Buonfiglio and the defendant Miller, to the Double Beach House and without justification, but at the request and direction of Annunziato, inflicted serious personal injuries to several innocent persons on the premises and great property damage to the building and its contents; that the injuries to persons and the damage to property were the results of the combined planning and efforts of Annunziato and the group of men who responded to his calls, including the defendant Miller; and that the defendants Annunziato and Miller were guilty of the crimes charged in the second and third counts of the information.

The claims of the defendants that the court erred in rulings on evidence are without merit and require no discussion.

Each defendant claims that the court was not justified in finding him guilty beyond a reasonable doubt. To determine the claim that upon all of the evidence the trial court could not have reasonably reached the conclusion that the defendants were guilty, we must look beyond the finding to the evidence. The finding, however, serves the purpose of showing the conclusions reached by the trial court, from conflicting evidence, as to facts it has found or the statements it was requested, but refused, to find; and as it is for the trial court to pass upon the weight and credibility of the evidence, these conclusions, if

reasonably reached, must be accepted. *State* v. *Dodez,* 120 Conn. 216, 219, 179 A. 653. "The trier may not reach a conclusion of guilt where the facts, established by the evidence, including those reasonably and logically inferred from other proven facts, are rationally consistent with the innocence of an accused. A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion. *State* v. *Smith,* 138 Conn. 196, 200, 82 A.2d 816. But the requirement of proof beyond a reasonable doubt does not mean that the proof must be beyond a possible doubt, and a possible hypothesis or supposition of innocence is far different from a reasonable supposition." *State* v. *Foord,* 142 Conn. 285, 295, 113 A.2d 591. Upon all the evidence, including the inferences which the court was amply warranted in drawing, it was justified in concluding that the defendants were guilty of the offenses charged in the second and third counts beyond a reasonable doubt.

There is no error.

In this opinion the other judges concurred.