STATE OF CONNECTICUT *v.* WILLIAM R. MAYELL

HOUSE, C. J., RYAN, SHAPIRO, LOISELLE and MACDONALD, Js.

Argued June 6—decided July 18, 1972

*Michael C. Hagstrom,* for the appellant (defendant).

*Thomas F. Wall,* state's attorney, for the appellee (state).

Loiselle, J. The defendant was charged with (1) robbery with violence and (2) binding with intent to commit crime. A jury found him guilty of robbery with violence, but not guilty of binding with intent to commit crime. The court subsequently found him to be a second offender under the second part of the information, pursuant to § 54-118 of the General

Statutes. The defendant has appealed, assigning error in certain rulings on evidence and the court's denial of his motions to dismiss and set aside the verdict.

The defendant's attack on the court's denial of his motion to set aside the verdict is dispositive of this appeal. The attack is considered by examining the evidence printed in the appendices to the briefs in order to determine whether the jury acted fairly, intelligently and reasonably in rendering their verdict. *State* v. *Shelton,* 160 Conn. 360, 361, 278 A.2d 782; *State* v. *Miller,* 154 Conn. 622, 624, 228 A.2d 136.

From the evidence offered, the jury could reasonably have found the following facts: On the night of August 21, 1968, Peter Plungis of Watertown, while in his farmhouse, saw a vehicle stop in a driveway to his home. He turned on an outside light and walked out of his home toward the vehicle. A man sitting in the driver's seat, who appeared to be covering his face with his hands, asked Plungis for directions when Plungis was about thirty-five feet from the house and about fourteen feet from the vehicle. At this point two men, whom Plungis had not seen, brutally attacked Plungis, bound him and rendered him unconscious, causing permanent disability. Plungis' nephew, who lived about a quarter of a mile away, heard "hollering" and observed unusual activity at his uncle's home and proceeded from his home to investigate. As he approached, the assailants took Plungis' billfold and fled, abandoning their vehicle. Plungis' nephew attended to his uncle's wounds and, with his rifle, fired into the gas tank and at a front tire of the vehicle, disabling it. He then left the premises to call the police. Plungis had approximately $1200 in his wallet; so far as he

knew, only those who had made purchases of cattle and hay from him knew that he possessed that amount of cash.

Edward Boker Co., Inc., Bronx, New York, owned the assailants' vehicle and maintained it for the sole use of Morris Unger, chairman of its board of directors. The company employed the defendant from February 26, 1968, through August 21, 1968, to drive the vehicle. On August 21, 1968, the defendant returned Unger to his home at 6 p.m.; the defendant's duties then required him to garage the automobile at a location directly across the street from the Unger residence on 72nd Street in the city of New York. On the morning of August 22, the Watertown, Connecticut, police informed the president of Edward Boker Co., Inc., Sidney Schwartzreich, that the company's vehicle was in Watertown. Schwartzreich then inquired at the garage about the vehicle and learned that it had not been returned to the garage on the evening of August 21. He was unsuccessful in his attempts to reach the defendant, either at the defendant's home in the city of New York or at the home of the defendant's mother in the city of Waterbury. The defendant never called for or requested the pay check which was due him. On August 22, the defendant called the Unger residence and inquired of a domestic whether Unger was "mad at him" about the disappearance of the vehicle. Other than this inquiry, the defendant made no report concerning the vehicle. The Watertown police sent out an all-points broadcast that reached thirteen states and indicated that it was looking for the defendant. After August 22, a Watertown police detective attempted to contact the defendant a number of times.

The Boker vehicle was "dusted" for fingerprints

and one clear print was found on the rearview mirror and another print was found superimposed on a third print. The clear fingerprint was identified as belonging to the defendant. On August 29, 1968, a warrant was issued for the arrest of the defendant. In April, 1969, the Watertown police received information from the city of New York as to the whereabouts of the defendant and commenced extradition proceedings. Because of internal difficulties at the Watertown police department, no one appeared for the department at the third extradition hearing in the city of New York or received notice of the decision denying extradition. The defendant was arrested in Waterbury in July, 1969.

The defendant offered evidence to prove the following facts: After leaving Unger at his residence on the evening of August 21, 1968, the defendant went to a cafe near 47th Street in the city of New York. He parked the Boker vehicle at a meter in the vicinity of the cafe and left the keys on the sun visor. He decided to leave the vehicle parked there through the night, as allowed by city parking regulations, because it was "more convenient" than returning it to the 72nd Street garage where it was supposed to be kept. From the cafe he went to his girl friend's home where he ate, read and watched television. He did not leave his girl friend's home to get the vehicle until 8:10 or 8:15 the following morning. He found that it was not where he had left it and, believing that it had been towed away, he called his girl friend to borrow money to redeem the vehicle. He went to the pound where confiscated vehicles were towed. He was informed that the vehicle was not there. He then called the Unger residence and told a maid that the vehicle had been stolen. Again, at about 4:30 p.m., he called the Unger residence

and was told that Unger was angry about the disappearance of the automobile. He decided not to return to work because he knew that he would be fired and he did not think "it was worth the humiliation" to collect the salary for working three days which was owed to him. He first learned of the crime involved in this case when extradition papers were served; when the extradition was denied, he believed that "it was all over." He visited his parents in Connecticut on several occasions and on one occasion, when he appeared at the Waterbury police station to inquire about a driver's license, he was arrested for the crimes charged here. At the time of the trial in January of 1970, the defendant had been a doorman at the Sheraton-Russell Hotel for five months. Before his job at the Sheraton-Russell, he had worked as a doorman at the Waldorf-Astoria Hotel for six months.

It is the state's claim that the defendant attempted to fabricate an alibi and that such attempt, together with the evidence which the state offered, amply supported the jury verdict convicting the defendant of robbery with violence. The evidence presented by the state was circumstantial; one of the circumstances relied on by the state was the defendant's alleged flight from the scene of the savage beating. Flight, when unexplained, tends to prove a consciousness of guilt. *State* v. *Miller,* 154 Conn. 622, 628, 228 A.2d 136; *State* v. *Ford,* 109 Conn. 490, 496, 146 A. 828; 1 Wharton, Criminal Evidence (12th Ed.) § 205; 1 Wigmore, Evidence (3d Ed.) § 276. The only evidence which supports this claim is that the defendant drove the Boker vehicle at about 6 p.m. one evening in the city of New York, which vehicle was found abandoned in Connecticut at about midnight with the keys in it; that his employer and a

detective tried to contact the defendant at his home and at his mother's home on August 22, 1968; that a thirteen-state alarm was sent out by the police on the same day without any explanatory evidence as to the effect of such an alarm, other than to inform other police departments that the defendant was wanted; that a detective attempted "a number of times" to contact the defendant, without any evidence as to what he did or the extent of his attempts; and that the defendant resisted extradition seven months later.

Assuming that the jury completely disbelieved the defendant's testimony, the evidence hardly supports a conclusion that the defendant fled. The fact that the defendant drove a vehicle at 6 p.m. in the city of New York which was found at about midnight in Watertown with the keys in the ignition is not a sufficient basis for a reasonable inference that the defendant was in Watertown at midnight. Moreover, the fact that the police sought the defendant cannot by itself support an inference of his flight. Flight may be established by proof of the efforts of the police to locate the defendant. See *United States* v. *Waldman,* 240 F.2d 449, 452 (2d Cir.). Such proof, however, must be supported by either direct or inferential evidence that the defendant knew he was wanted by the police. With that evidence, the vain efforts of the police to find him would tend to show that he intended to elude them. See *Kanner* v. *United States,* 34 F.2d 863, 866 (7th Cir.); note, 25 A.L.R. 886, 899; 29 Am. Jur. 2d, Evidence, §§ 280, 281. In the case before us, the state was able to show only that the defendant knew of and opposed the attempt at his extradition. That the defendant exercised his legal right to defend against his extradition in New York proceedings is

not a proper basis for inferring that the defendant fled from the police or possessed a consciousness of guilt—just as pleading not guilty or defending against any criminal charge is not a proper basis for inferring a consciousness of guilt. The state's argument that the flight of the defendant was a proper element to be considered by the jury is not supported by the evidence.

The fact that the defendant's fingerprints were on the rearview mirror of the abandoned vehicle, in and of itself, is of no moment. Unless it can be shown that the circumstances are such that the fingerprints could have been impressed only at the time the crime was perpetrated, the presence of the defendant's fingerprints on the rearview mirror does not establish his connection with the crime charged. See *United States* v. *Corso,* 439 F.2d 956, 957 (4th Cir.); *United States* v. *Jones,* 433 F.2d 1107, 1109 n. (D.C. Cir.); *United States* v. *Collon,* 426 F.2d 939, 942 (6th Cir.); *Borum* v. *United States,* 380 F.2d 595 (D.C. Cir.); *Rhoden* v. *State,* 227 So. 2d 349 (Fla. App.); *Brunson* v. *State,* 9 Md. App. 1, 261 A.2d 794, following *McNeil* v. *State,* 227 Md. 298, 176 A.2d 338; note, 28 A.L.R.2d 1115, 1155–57. It is undisputed that the defendant was regularly employed to drive the vehicle and was rightfully in it six hours before the time the crime was committed. Under these circumstances, the fact that the defendant's fingerprints were found on the vehicle has no probative force.

The state heavily relies on the right of the jury to find the evidence offered by the defendant to be a fantastic and obviously concocted story which attempted to fabricate an alibi. It is apparent that the jury could so find. Even assuming, however, that the jury rejected all of the evidence which the

defendant offered, the jury would not have been entitled to make an affirmative finding to the contrary. *Marquis* v. *Drost,* 155 Conn. 327, 332, 231 A.2d 527; *Panicali* v. *Connecticut State Board of Labor Relations,* 147 Conn. 344, 348, 160 A.2d 903; *Burritt Mutual Savings Bank* v. *New Britain,* 146 Conn. 669, 680, 154 A.2d 608; *Walkinshaw* v. *O'Brien,* 130 Conn. 151, 153, 32 A.2d 639; *Meagher* v. *Colonial Homes Co.,* 109 Conn. 343, 347, 146 A. 609; *State* v. *Poplowski,* 104 Conn. 493, 495, 133 A. 671.

Obviously the jury concluded that the defendant was one of the three assailants involved in the Plungis robbery on August 21, 1968. We do not believe that the evidence was sufficient to justify that conclusion. Considering that (1) the presence of the defendant's fingerprints on the rearview mirror is of no probative force, that (2) the evidence was insufficient to establish flight, and that (3) the rejection of the defendant's testimony does not authorize an affirmative finding to the contrary, the evidence, construed most favorably to the state, established only that the defendant operated a vehicle in the city of New York on August 21, 1968, at about 6 p.m., and that the vehicle was on the Plungis' premises at about midnight that evening with keys in the ignition. No evidence was offered to show that the defendant knew or had any connection with Plungis or that he knew that Plungis had a substantial amount of money on his person on August 21, 1968. No evidence was offered to tie the defendant with Plungis in any way. "A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other

rational conclusion." *State* v. *Foord,* 142 Conn. 285, 295, 113 A.2d 591; *State* v. *Kelsey,* 160 Conn. 551, 553, 274 A.2d 151; *State* v. *Reid,* 154 Conn. 37, 40, 221 A.2d 258; *State* v. *Annunziato,* 145 Conn. 124, 136, 139 A.2d 612. Although it is true that a conviction may be supported wholly by circumstantial evidence, that evidence must be sufficient to prove guilt beyond a reasonable doubt. *State* v. *Reid,* supra. The evidence was insufficient to establish the guilt of the defendant to that degree.

It may be that the defendant was either a participant or an accomplice in the savage beating of Plungis but, in a trial of a person charged with the commission of a crime, the time-tested safeguards which the law has erected for the protection of the innocent may not be subverted in order to punish one who may be a guilty person. *State* v. *Doucette,* 147 Conn. 95, 108, 157 A.2d 487, overruled on other grounds, *State* v. *Tillman,* 152 Conn. 15, 20, 202 A.2d 494; *State* v. *Ferrone,* 97 Conn. 258, 270, 116 A. 336.

There is error, the judgment is set aside and the case is remanded with direction to grant the motion to set the verdict aside.

In this opinion the other judges concurred.