STATE OF CONNECTICUT *v.* BRYANT COLEMAN
(3991)

BORDEN, O'CONNELL and STOUGHTON, Js.

Argued January 6—decision released June 14, 1988

*James J. Ruane,* special public defender, with whom, on the brief, were *Donald D. Dakers,* public defender, and *Susan M. Hankins,* assistant public defender, for the appellant (defendant).

*Mitchell S. Brody,* deputy assistant state's attorney, with whom, on the brief, was *Patrick Clifford,* assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals from the judgment of conviction, after a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1),[1] robbery in the first degree in violation of General Statutes § 53a-134 (a) (3),[2] and sexual assault in the first degree in violation of General Statutes § 53a-70 (a).[3]

---

[1] General Statutes § 53a-101 (a) (1) provides in pertinent part: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with . . . a . . . dangerous instrument . . . ."

[2] General Statutes § 53a-134 (a) (3) provides in pertinent part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime . . . he . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[3] General Statutes § 53a-70 (a) provides in pertinent part: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse . . . by the threat of the use of force against such other person . . . which reasonably causes such person to fear physical injury . . . .'

The defendant claims (1) that the court erred in its instructions to the jury regarding circumstantial evidence, (2) that the court erred in its instruction regarding the defendant's testimony, and (3) that the evidence was insufficient to sustain the burglary and robbery convictions. We find no reversible error.

The jury could reasonably have found the following facts. The victim lived in a second floor apartment on Park Street in New Haven. On May 13, 1984, at approximately 3 p.m., the victim responded to repeated ringing of her first floor door buzzer by going downstairs. No one was there. As she returned to her apartment, she observed a pile of clothing in the hallway. When she reentered her apartment, the defendant was in her bedroom. He grabbed her and threatened to cut her with a shiny metallic object which he was holding, and which he told the victim was a knife. He pressed the metal object to her skin, and she thought it was a knife. The defendant was wearing something on his hand which the victim described as "looking something like a bandage because it had sort of that flesh, brown flesh kind of look, not really flesh tones but in that color range."

The defendant was naked from the waist up. He demanded money from the victim, and she gave him $37 from her wallet, consisting of a $20 bill, a $10 bill, a $5 bill and two $1 bills. He then forced her to go into the bathroom and to undress. There he attempted to penetrate her anally, and forced her to perform fellatio on him while threatening to cut and blind her with the metallic instrument. The defendant then ordered the victim to remove his sneakers. As she was doing so, the victim observed that the lace on his left sneaker was longer than the right lace, and was wrapped around his ankle. She also observed that he was wearing striped pants with frayed bottoms, and gray gym shorts underneath his pants. As the defendant removed his

pants, a black "afro comb" and a "pink yellow, salmon colored" plastic identification card fell from his pants pocket. The identification card fell face down. The defendant retrieved these items and put them back in his pants pocket.

The defendant then told the victim to go into the hallway and retrieve the pile of clothing. As she did so, she observed that among the clothing was a light colored poplin jacket with striped elastic cuffs. When she returned to the apartment, she threw the clothing down and escaped from the defendant by jumping out of a window and making her way along a ledge to her neighbor's apartment, where the police were called.

The incident lasted approximately twenty minutes. It was a warm, sunny day, and it was clear and light in the victim's apartment because of its many windows. During the incident, the victim engaged the defendant in conversation because, as she testified, "If I would get away . . . I would want to know to describe him, what he looked like." She also testified that she "spent a lot of time looking at his face."

Officer Michael Ferraro of the New Haven police department arrived quickly. The victim described her assailant to Ferraro as a nineteen to twenty year old black male, approximately five feet ten inches to six feet tall, weighing one hundred sixty to two hundred pounds, wearing bluish colored pants with a white thin stripe, an off-white colored jacket with brownish trim at the cuffs and waistband, and high white sneakers.

The victim accompanied Ferraro in his police car in search of her assailant. During the search she observed young black males, but none who appeared to be the assailant. At an intersection approximately five blocks from the victim's apartment, the victim recognized the defendant as her assailant. As the police car approached the defendant, the defendant turned sharply in another

direction and held a bouquet of flowers up to his face. When Ferraro stopped the defendant, the victim repeatedly and positively identified him as her assailant. In response to Ferraro's request to the victim for further evidence of the reliability of her identification of the defendant, the victim told Ferraro to lift the defendant's pants legs. This disclosed that the lace of the defendant's left sneaker was wrapped around his ankle. The victim then said, "That's definitely him." The victim then told Ferraro about the identification card and comb which had fallen from her assailant's pants pocket. Ferraro then searched the defendant. In his pants pocket were a plastic identification card with the same colors described by the victim, a black "afro" comb or pick, a shiny metal bottle opener, and $30 in cash consisting of a $20 bill and $10 bill. The defendant was wearing a light colored poplin jacket with striped cuffs, and corduroy pants with frayed cuffs. He was carrying a plastic bag containing, inter alia, a pair of brown stretch gloves which were consistent with what the assailant was wearing on his hand at the time of the crime. A subsequent search of the defendant at the police station disclosed that the defendant was also wearing gray gym shorts underneath his trousers.

At trial, the victim positively identified the defendant. She also identified the defendant's jacket, shorts, pants and sneakers as similar to those worn by the assailant in her apartment, and the defendant's plastic identification card as the same kind of card which fell from his pants pocket in her bathroom.

The defendant presented an alibi defense. He testified that he had spent the evening prior to the crime at his girlfriend's room in a rooming house in New Haven, leaving there at approximately 4 a.m. and walking home to his mother's house on Sylvan Avenue in New Haven. He testified further that he left his mother's house at approximately 12:30 p.m. and played

basketball until approximately 2:30 p.m. He testified that he then went to a cafe where he played video games until approximately 3:20 p.m. After leaving the cafe, he bought some flowers for his girlfriend from a street vendor, and was walking back to his girlfriend's house when he was stopped by the police officer and the victim. The defendant specifically denied assaulting or robbing the victim, and denied having been in her apartment.

The defendant testified that he had a can opener in his pocket because he had borrowed the item the night before from his girlfriend's sister, who lived in the same rooming house, to open some cans of food, and that he had then put it into his pocket and forgotten to return it to her. He testified that he always wore the gloves when he rode his bicycle, even in very warm weather, that he had left his bicycle at his girlfriend's house because it had a flat tire, and that when he was arrested he was on his way to his girlfriend's house to fix the tire. He also testified that he had started the day with approximately $42.75 in cash in his pocket, and had spent some money on a soft drink and on the video games, and $10 to buy the flowers. The defendant's mother, girlfriend and his girlfriend's sister testified in corroboration of parts of his testimony.

I

The defendant first claims that the court's instructions regarding inferences drawn from circumstantial evidence diluted the constitutional requirement that the state prove guilt beyond a reasonable doubt. The court's instructions including the all too familiar language that, in drawing inferences from circumstantial evidence, it is required "[f]irst, that the fact from which you are asked to draw the inference has itself been proven beyond a reasonable doubt; [and] secondly, that the inference that you are asked to draw is not only logi-

cal and reasonable but is strong enough so that you can find that it is more probable than not that the fact to be inferred is true." The defendant argues that this charge constituted reversible error because circumstantial evidence played a major role in the state's case in three ways: (1) to bolster the direct evidence of the identity of the defendant; (2) to establish consciousness of guilt by the defendant; and (3) as the only evidence to establish the element of a dangerous instrument in the proof of the burglary and robbery offenses. See footnotes 1 and 2, supra. We disagree.

We first note that, despite the defendant's failure to except to the court's jury charge, his claim is reviewable under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). *State* v. *McDonough,* 205 Conn. 352, 354, 533 A.2d 857 (1987). Moreover, it is well established that such an instruction is erroneous.[4] Id., 355–56; see *State* v. *Hufford,* 205 Conn. 386, 407, 533 A.2d 866 (1987). The only question, therefore, is whether the error is reversible in this case. We conclude that it is not.

"In considering the harmfulness of an erroneous instruction on circumstantial evidence, we have distinguished between cases where circumstantial evidence is the primary proof of an element of the crime and those where direct testimony plays the major role." *State* v. *McDonough,* supra, 358. "Unlike intent, [which is typically proven by circumstantial evidence] such issues as identity and whether the crime charged has occurred, are ordinarily proved by direct testimony with circumstantial evidence playing a subordinate role." Id. In these cases, we review the charge as a whole to determine whether there is a reasonable possibility that the jury was misled by the erroneous

---

[4] We note, however, that at least two members of our Supreme Court now apparently conclude that such an instruction is not necessarily erroneous. See *State* v. *McDonough,* 205 Conn. 352, 362–64, 533 A.2d 857 (1987) (*Callahan and Covello, Js.,* concurring).

instruction. Id. This instruction does not have "constitutional significance where there is sufficient direct evidence, not implicated by the error, to establish all of the essential elements of the crime charged. In similar cases, where the principal issue at trial was the credibility of the victim, where there was substantial direct evidence of the crimes charged, and where intent was not seriously disputed, we have held erroneous instructions suggesting the probability standard for drawing inferences from circumstantial evidence to be harmless error." Id., 360.

In this case, the direct testimony of the victim played the major role. The only real dispute in the trial was the identity of the defendant as the perpetrator, and that was proved primarily by the direct testimony of the victim, whose credibility in identifying the defendant was at issue. Indeed, the defendant's counsel argued as much to the jury.[5] Contrary to the first two assertions of the defendant, any circumstantial evidence employed to bolster the victim's identification of the defendant and to establish the defendant's consciousness of guilt, played a subordinate, and not the major, role. Similarly, the principal evidence regarding the defendant's use of a dangerous instrument was the direct testimony of the victim in describing the shiny metal object that the defendant held in his hand, with which he threatened and touched her during the criminal episode. Under these circumstances, having reviewed the court's instructions as a whole, we conclude that it is not reasonably possible that the erroneous instruction misled the jury in rendering its verdict on the burglary and robbery charges.

---

[5] The defense counsel stated: "Here you have an eyewitness identification case, not a circumstantial evidence an eyewitness identification case—you must be convinced beyond a reasonable doubt of an eyewitness who was under great stress. That is not the same as other kinds of cases which are supported by circumstantial evidence. . . . Please consider the evidence. It's a tough case, because it's a case where nothing is disputed, it seems to me, but the identification of this defendant."

## II

We next consider the defendant's claim that the court's instructions regarding the defendant's testimony were erroneous because they were not even-handed and impermissibly singled out his testimony, thereby undermining the presumption of innocence, impermissibly reducing the state's burden of proof, and impermissibly burdening the defendant's right to testify in his own defense.[6] We agree that the court's instructions were erroneous, but we conclude that this error was harmless.

The defendant challenges the following portion of the court's instructions to the jury: "Now in this particular case the accused took the witness stand and he has a perfect right to do so. Although the state clearly has the burden of proof to establish guilt beyond a reasonable doubt and although the defendant clearly has the right to elect not to testify, if he does testify a jury may properly base its finding of guilt in part on the defendant's testimony and their disbelief in its truth.

"When the defendant elects to testify on his own behalf he assumes the risk that the jury cannot only disbelieve his story but also might wonder, quite properly, why his explanation of his conduct was so improbable, if that is your judgment.

"The accused stands before you just like any other witness and he is entitled to the same considerations and must have his testimony measured in the same way as that of any other witness. However, in weighing the credibility of the accused's testimony you will consider the interest of the accused in the case as you would con-

---

[6] Although the defendant purports to rely on both the federal and state constitutions, he offers no separate analysis under the state constitution, which we decline to undertake. *State* v. *Camerone,* 8 Conn. App. 317, 321 n.1, 513 A.2d 718 (1986).

sider that of any other person who has testified and in that connection you will consider the importance to the accused of the outcome of this trial."

The defendant did not except to the court's instructions. It is well settled, however, that under *State* v. *Evans,* supra, the defendant may challenge on appeal an instruction regarding the defendant's credibility arising from his interest in the outcome of the case. *State* v. *Mack,* 197 Conn. 629, 637, 500 A.2d 1303 (1985); *State* v. *Avcollie,* 188 Conn. 626, 637, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983).

We have recently considered and rejected a different challenge to a portion of a similar charge. In *State* v. *Smith,* 10 Conn. App. 624, 525 A.2d 116, cert. denied, 204 Conn. 809, 528 A.2d 1156 (1987), the defendant focused only on that portion of the charge which stated: " 'When the defendant elects to testify on his own behalf, he assumes the risk that the jury cannot only disbelieve his story, but might also wonder quite properly *why his explanation of his conduct was so improbable,* if that is your finding.' " (Emphasis in original.) Id., 639.[7] We rejected the defendant's claim that the portion of the charge challenged violated his right to an impartial jury. Id., 638–40. In this case, the defendant raises different challenges, and his challenges are directed to the court's entire charge regarding his testimony. *State* v. *Smith,* supra, therefore, does not control this case.

Our Supreme Court and this court have repeatedly held to be constitutionally permissible instructions that

[7] Although in *Smith* we quoted the court's entire charge regarding the defendant's credibility, we only considered the portion quoted in the text, on which the defendant's claim in that case focused. See *State* v. *Smith,* 10 Conn. App. 624, 639 n.5, 525 A.2d 116, cert. denied, 204 Conn. 809, 528 A.2d 1156 (1987).

a defendant's interest in the outcome of the trial should be considered by the jury in evaluating his credibility. See, e.g., *State* v. *Higgins,* 201 Conn. 462, 475–76, 518 A.2d 631 (1986); *State* v. *Mack,* supra, 636–38; *State* v. *Maselli,* 182 Conn. 66, 74, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 866, 66 L. Ed. 2d 807 (1981); *State* v. *Waterman,* 7 Conn. App. 326, 353, 509 A.2d 518, cert. denied, 200 Conn. 807, 512 A.2d 231 (1986). These holdings have been qualified, however, by a caution that the court would examine any future instructions in order to determine whether they involved a "significant variation from those we have approved previously"; *State* v. *Higgins,* supra, 476; stressing "the importance of evenhandedness in referring to the defendant's interest as compared with that of other witnesses . . . [and] recogniz[ing] that technically correct instructions on this subject may violate this principle if repeated unnecessarily or overemphasized in some other manner. See *State* v. *Kurvin,* [186 Conn. 555, 570 n.3, 442 A.2d 1327 (1982)]." *State* v. *Mack,* supra, 638.

Because the defendant did not except to the court's instructions which he challenges on appeal, "[w]e must . . . examine the nuances of language, belatedly relied upon by the defendant, only for the purpose of determining whether they are significant enough to have affected the fairness of his trial." Id., 637. In this connection, we note that the third paragraph of the instructions[8] is essentially identical to the charge approved by our Supreme Court in *State* v. *Mack,*

[8] "The accused stands before you just like any other witness and he is entitled to the same considerations and must have his testimony measured in the same way as that of any other witness. However in weighing the credibility of the accused's testimony you will consider the interest of the accused in the case as you would consider that of any other person who has testified and in that connection you will consider the importance to the accused of the outcome of this trial."

supra, 636–37 n.8. We focus our analysis, therefore, on the language of the first two paragraphs of the instruction.[9] That analysis leads us to conclude that the instructions were not evenhanded in referring to the defendant's testimony as compared with other witnesses, and that this defect impermissibly reduced the state's burden of proof, and impermissibly burdened the defendant's right to testify in his own defense.

The language of the first two paragraphs of the instructions goes significantly beyond the instructions previously approved by our Supreme Court regarding the defendant's credibility. See, e.g., *State* v. *Higgins,* supra; *State* v. *Mack,* supra; *State* v. *Maselli,* supra; *State* v. *Waterman,* supra. In none of these cases did the trial court instruct the jury that if the defendant testifies, "a jury may properly base its finding of guilt in part on the defendant's testimony and their disbelief in its truth," or that a testifying defendant "assumes the risk that the jury cannot only disbelieve his story but also might wonder, quite properly, why his explanation of his conduct was so improbable, if that is your judgment." Moreover, a comparison of these instructions with the court's instructions regarding the credibility of other witnesses discloses no similar instruction regarding those witnesses. These instructions were not, therefore, evenhanded; they emphasized an aspect of the defendant's credibility which was not shared by the instructions on the credibility of other witnesses.

---

[9] "Now in this particular case the accused took the witness stand and he has a perfect right to do so. Although the state clearly has the burden of proof to establish guilt beyond a reasonable doubt and although the defendant clearly has the right to elect not to testify if he does testify a jury may properly base its finding of guilt in part on the defendant's testimony and their disbelief in its truth.

"When the defendant elects to testify on his own behalf he assumes the risk that the jury cannot only disbelieve his story but also might wonder, quite properly, why his explanation of his conduct was so improbable, if that is your judgment."

We next consider the defendant's argument that the instructions undermined the presumption of innocence. We disagree with this claim.

The defendant draws his principal support for this claim from the dissenting position of Justice Bogdanski which our Supreme Court has repeatedly rejected. See, e.g., *State* v. *Maselli,* supra; *State* v. *Mastropetre,* 175 Conn. 512, 400 A.2d 276 (1978); *State* v. *Bennett,* 172 Conn. 324, 374 A.2d 247 (1977); *State* v. *Jonas,* 169 Conn. 566, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 332 (1976). Furthermore, the United States Supreme Court has made clear that the function of the presumption of innocence is analytically unrelated to the issues presented by this case.

In *Taylor* v. *Kentucky,* 436 U.S. 478, 484, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978), the United States Supreme Court noted that the presumption of innocence and the state's burden of proving guilt beyond a reasonable doubt are "logically similar." Id., 484. That court stated that the presumption of innocence "is not evidence—not even an inference drawn from a fact in evidence—but instead is a way of describing the prosecution's duty both to produce evidence of guilt and to convince the jury beyond a reasonable doubt." Id., 483–84 n.12. The court recognized that the presumption of innocence is an inaccurate description of the right of the accused to remain securely inactive until the prosecution has carried its burden of persuasion. Id. "The principal inaccuracy is the fact that it is not technically a 'presumption'—a mandatory inference drawn from a fact in evidence. Instead, it is better characterized as an 'assumption' that is indulged in the absence of contrary evidence." Id., quoting *Carr* v. *State,* 192 Miss. 152, 156, 4 So. 2d 887 (1941).

In *Taylor,* the court defined the principal function of the presumption of innocence: It is aimed to ensure

that the jury bases its decision solely on the evidence presented, and not on extraneous factors such as arrest, information, arraignment, custody and the status of the defendant as an accused. *Taylor* v. *Kentucky,* supra, 484–86. It provides significant guidance and caution to the jurors, over and above the rule regarding the state's burden of persuasion, " 'to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced . . . to consider, in the material for their belief, *nothing but the evidence,* i.e., no surmises based on the present situation of the accused.' " (Emphasis in original.) Id., 485, quoting 9 J. Wigmore, Evidence (3d Ed.) p. 407. The effect of an instruction on the presumption of innocence "simply represents one means of protecting the accused's constitutional right to be judged solely on the basis of proof adduced at trial." *Taylor* v. *Kentucky,* supra, 486.

Viewed in the light of this analysis, it becomes clear that the court's instructions did not undermine the presumption of innocence, because they had nothing to do with that principle. They did not suggest that the jury could decide the case based on factors other than the evidence produced in the trial. They did not suggest that the jury could, in deciding the case, rely on extraneous factors such as the arrest or information, or the defendant's status as the accused. Indeed, the focus of the instructions was on evidence in the case, namely, the defendant's testimony, not on factors outside that evidence.

We turn, therefore, to the remainder of the defendant's claim, namely, that the lack of evenhandedness in the instructions impermissibly reduced the state's burden of persuasion in proving guilt beyond a reasonable doubt, and impermissibly burdened the defendant's right to testify. We agree.

The particular language of this instruction reduced the state's burden of proof by permitting the jury to consider an essential fact or facts proven by the state, at least in part, from the jury's disbelief of the defendant's testimony. See *People* v. *Russell,* 266 N.Y. 147, 153–54, 194 N.E. 65 (1934) (holding that a similar instruction reduced the state's burden of proof). The standard of proof beyond a reasonable doubt refers to the degree of certainty that the evidence produces in the minds of the jurors. *Jackson* v. *Virginia,* 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State* v. *DelVecchio,* 191 Conn. 412, 419, 464 A.2d 813 (1983); *State* v. *Pannone,* 9 Conn. App. 111, 115, 516 A.2d 1359 (1986). This constitutional standard focuses on the importance of *probative evidence* establishing guilt. Its purpose is to ensure that the jury's determination is based on sufficient evidence probative of guilt. It requires "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—*defined as evidence* necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." (Emphasis added.) *Jackson* v. *Virginia,* supra, 316. This standard recognizes that it is "the responsibility of the trier of fact *fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."* (Emphasis added.) Id., 319. It requires that the defendant's guilt be established by *"probative evidence."* (Emphasis added.) *Estelle* v. *Williams,* 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976).

It is axiomatic under Connecticut law that, while a jury may reject a defendant's testimony, " 'a jury in rejecting such testimony cannot conclude that the opposite is true.' " *State* v. *Alfonso,* 195 Conn. 624, 634, 490 A.2d 75 (1985), quoting *Novak* v. *Anderson,* 178 Conn. 506, 508, 423 A.2d 147 (1979); see also *State* v. *Carter,*

196 Conn. 36, 50, 490 A.2d 1000 (1985) (*Shea, J.,* dissenting) (trier cannot make affirmative factual finding from disbelief of testimony); *State* v. *Mayell,* 163 Conn. 419, 426–27, 311 A.2d 60 (1972) (jury cannot make affirmative finding from disbelief of obviously concocted alibi testimony of defendant). Thus, under Connecticut law, the jury is not permitted to infer, from its disbelief of the defendant's testimony, that any of the facts which he denied were true.[10] Under this principle, therefore, the jury is barred from directly inferring that a defendant was present at the scene of a crime from its finding that he was lying when he denied his presence there. *State* v. *Mayell,* supra.

Since the principle of proof beyond a reasonable doubt refers to the degree of certainty produced in the jurors' minds, since that principle requires that the jury's

---

[10] Our research discloses that the United States Court of Appeals for the Ninth Circuit, apparently alone among American courts, has held squarely to the contrary. That court holds that "[d]isbelief of a defendant's own testimony may provide at least a partial basis for a jury's conclusion that the opposite of the testimony is the truth." *United States* v. *Martinez,* 514 F.2d 334, 341 (9th Cir. 1975), and cases cited therein. Indeed, the language of the trial court's charge in the case before us appears to have come directly from *United States* v. *Ledesma,* 499 F.2d 36, 43 (9th Cir. 1974). This line of cases, however, is directly contrary to the well settled law in Connecticut.

The rule prohibiting such a finding apparently first surfaced in Connecticut in *State* v. *Poplowski,* 104 Conn. 493, 495, 133 A. 671 (1926), where the court, citing Massachusetts and New York cases, stated: " 'Facts cannot be established by not believing witnesses who deny them.' " As a matter of human experience and inference, however, if a witness specifically denies having done something and he is found to be, or admits to be, lying in that denial, it is certainly a permissible if not an inevitable inference that he in fact did it. At least one other court has recognized the logical validity of such an inference, but has nonetheless recognized the rule prohibiting the inference on the policy ground that such proof would be unreviewable on appeal. See *Dyer* v. *MacDougall,* 201 F.2d 265, 268–69 (2d Cir. 1952) (L. Hand, J.). At this time, however, the rule is too firmly rooted in Connecticut jurisprudence for us to question. See *State* v. *Mayell,* 163 Conn. 419, 426–27, 311 A.2d 60 (1972), and cases cited therein.

determination be based on sufficient evidence proba-
tive of guilt, and since under our law a jury may not
directly infer guilt from its disbelief of the defendant's
testimony, we conclude that it violates that principle
for the court to instruct the jury that it may use that
disbelief to find proven a fact or facts necessary to its
determination of guilt. Put another way, because a
jury's disbelief in the defendant's denial of certain facts
cannot be the basis for an inference of the contrary of
those facts, such denial cannot be considered as evi-
dence probative of those facts or be used directly to
supplant any reasonable doubt about the defendant's
guilt, and the court may not instruct the jury that it
may consider the defendant's testimony in such a way.
Such an instruction violates the principle of proof
beyond a reasonable doubt because it puts the court's
unique prestige and power as perceived by the jury;
*State* v. *Tatem,* 194 Conn. 594, 599, 483 A.2d 1087
(1984); behind an inference of guilt which the law spe-
cifically prohibits, and thus specifically converts evi-
dence, namely the defendant's testimony, which if
disbelieved must be given no weight in the jury's cal-
culus, into evidence either directly probative of guilt
or available to supplant what may be a reasonable doubt
about guilt.

We do not suggest that a violation of the principle
of proof beyond a reasonable doubt occurs whenever
the jury is erroneously exposed to evidence which is
not probative of guilt. Such a suggestion would con-
vert every erroneous evidentiary ruling on relevance
into a constitutional violation. Nor do we suggest that
it violates the principle of proof of guilt beyond a rea-
sonable doubt for the jury to base its conclusion of guilt
on all the evidence, including that adduced by the
defendant. See *State* v. *Simino,* 200 Conn. 113, 118,
509 A.2d 1039 (1986). Where, as here, however, the
law specifically forbids such evidence to be considered

in the calculus leading to a determination of guilt, it violates that principle for the court specifically to instruct the jury that it may consider that evidence for that forbidden purpose.

The first two paragraphs of the instruction at issue here were so flawed. By instructing the jury that "if [the defendant] does testify a jury may properly base its finding of guilt in part on the defendant's testimony and their disbelief in its truth," and by linking that instruction with the instruction that the jury, upon such disbelief, "might wonder, quite properly, why his explanation of his conduct was so improbable," the court permitted the jury to conclude that, if it disbelieved the defendant's testimony, the contrary of that testimony was true. Thus, the jury was told in effect by the court that from its disbelief in the defendant's alibi testimony, it could find that he was present in the victim's apartment and that he did assault and rob her, or that any reasonable doubt which it may have entertained arising from the other evidence in the case, or lack thereof, could be supplanted by its disbelief of the defendant's testimony. This constituted permission by the court to the jury to use its disbelief of the defendant's testimony for a purpose which our law forbids, and directly to use the result of that forbidden process in its determination of the defendant's guilt.

In this connection, we are not persuaded by the state's argument that the court's use of the phrase "in part" sufficiently limited the jury's improper use of the defendant's testimony. What that phrase refers to is unclear. If it were apparent that it referred only to the use of the defendant's testimony by way of consciousness of guilt, or to the principle that disbelief of part of his testimony could permit disbelief of all; see infra; our conclusion might be different. In the context of the charge as given, however, that phrase permitted the jury to conclude that at least the only disputed element

of the crimes charged, namely, the defendant's identity as the perpetrator; see *State* v. *Murrell,* 7 Conn. App. 75, 80, 507 A.2d 1033 (1986); D. Borden & L. Orland, Connecticut Criminal Jury Instructions § 3.13; could be proven by a disbelief in his testimony, or that the jury could use that disbelief to supplant any reasonable doubt it may have had about that element. Such a conclusion would be improper under our law.

The court's instructions also impermissibly burdened the defendant's right to testify. It is axiomatic that a defendant has a federal constitutional right to testify in his own defense. *Rock* v. *Arkansas,* 483 U.S. 44, 52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); see also *State* v. *Higgins,* supra, 477 (referring to constitutional right to testify implicitly recognized under due process provisions of state and federal constitutions). This right is "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Rock* v. *Arkansas,* supra. It is true that this right "is not without limitation." Id., 55. Just as the defendant's constitutional right to silence may not be unduly burdened, however; *South Dakota* v. *Neville,* 459 U.S. 553, 565, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983); his constitutional right to testify, which is a corollary of his right to silence, must also be regarded as being free from undue cost. "[R]estrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock* v. *Arkansas,* supra.

It is true that when a defendant testifies, he subjects his testimony to all appropriate tests of credibility applicable to any other witness, including the jury's evaluation of his interest in the outcome of the trial. See *State* v. *Kurvin,* supra, 570. It is also true that he opens his case to fair comment by the state in final argument on his "failure to support his own factual theories with [other] witnesses." *State* v. *Kluttz,* 9 Conn. App. 686,

706, 521 A.2d 178 (1987); and that he opens himself to the possibility of enhanced punishment if the sentencing judge believes that he lied on the witness stand. *United States* v. *Grayson,* 438 U.S. 41, 98 S. Ct. 2610, 57 L. Ed. 2d 582 (1978); *State* v. *Huey,* 199 Conn. 121, 505 A.2d 1242 (1986). We conclude, however, that the court's instructions to the jury in this case imposed an arbitrary and disproportionate cost on the defendant's assertion of his right to testify.

As noted above, it has long been our law that the jury cannot infer facts from its disbelief of the defendant's testimony. *State* v. *Alfonso,* supra, 634; *State* v. *Mayell,* supra. The defendant in this case, in making his "tactical decision" on whether to testify; *Brooks* v. *Tennessee,* 406 U.S. 605, 612, 92 S. Ct. 1891, 32 L. Ed. 2d 358 (1972); was entitled to rely on that rule of law. Although he assumed the risk that the jurors would disbelieve him, he cannot be held to assume the additional risk, which the court's instructions permitted to be imposed on him, that their disbelief either could itself supply a fact which the state had the burden to prove, or could operate directly to cure a reasonable doubt about that fact. That is simply too heavy a burden on the assertion of his constitutional right to testify, and serves no legitimate interest of the state which we can perceive.

The conclusion we have reached, namely, that the first two paragraphs of the court's instructions were erroneous, does not mean, however, that a trial court may not appropriately instruct the jury regarding the link between a determination that a defendant has testified falsely and consciousness of guilt on his part. Just as the jury may consider a defendant's lies to the police as consciousness of guilt; *State* v. *Fullard,* 5 Conn. App. 338, 342, 497 A.2d 1041 (1985); it may under appropriate circumstances also consider a defendant's false testimony at trial as consciousness of guilt. *United*

*States* v. *Fabric Garment Co.,* 262 F.2d 631, 639 (2d Cir. 1958), cert. denied, 359 U.S. 989, 79 S. Ct. 1117, 3 L. Ed. 2d 978 (1959) (jury may have considered defendant's testimony "entirely false and fabricated and . . . indicative of consciousness of guilt"); accord *United States* v. *Teasley,* 408 F.2d 1012, 1013 (7th Cir.), cert. denied, 396 U.S. 880, 90 S. Ct. 161, 24 L. Ed. 2d 139 (1969); see also *Johnson* v. *United States,* 426 F.2d 651, 656 (D.C. Cir. 1970), cert. dismissed, 401 U.S. 846, 91 S. Ct. 1258, 28 L. Ed. 2d 523 (1971); *Thompson* v. *United States,* 405 F.2d 1106, 1107–1108 (D.C. Cir. 1968). The jury's determination that a defendant's conduct evinces a consciousness of guilt is not the same, however, as a direct inferential step from a disbelief in his testimony to proof of facts on which the state has the burden of persuasion.

Nor does our conclusion mean that the defendant is insulated from the principle, applicable to all witnesses, that disbelief of part of his testimony may, if the jury deems it appropriate, justify disbelief of all of that testimony. The court may properly instruct the jury that it may apply to the defendant the principle of falsus in uno, falsus in omnibus. *Raia* v. *Topehius,* 165 Conn. 231, 234–36, 332 A.2d 93 (1973). The court may not, however, instruct the jury that it is entitled to find that the contrary of the disbelieved testimony is the truth.

The challenged instructions in this case cannot fairly be read to refer to the concept of consciousness of guilt or to the principle of falsus in uno, falsus in omnibus. The court charged on those matters in other parts of the jury charge quite separate from these instructions. We must read the court's instructions as it is likely the jury heard them. *State* v. *Foshay,* 12 Conn. App. 1, 27, 530 A.2d 611, cert. granted in part, 205 Conn. 813, 532 A.2d 587 (1987). Such a reading precludes the conclusion that, when the court stated to the jury that it could base a finding of guilt on its disbelief of the defend-

ant's testimony, the court was simply referring to the concept of consciousness of guilt, or to the principle that the jury could, from its disbelief of part of the defendant's testimony, disbelieve all of it, and precludes the conclusion that the jury heard that instruction as such a reference.

This analysis does not end our inquiry, however. We must consider whether the error in the court's instructions requires reversal. This requires application of the harmless error doctrine in the context of a federal constitutional error.

We therefore consider the proper standard to apply in deciding whether the error was harmless. Both our Supreme Court and this court have stated that whether an instructional error in a criminal case requires reversal of the conviction depends on whether the error is nonconstitutional or constitutional. If the instructional error is nonconstitutional, the defendant has the appellate burden of establishing that it is *reasonably probable* that the jury was misled. *State* v. *Shifflett,* 199 Conn. 718, 754, 508 A.2d 748 (1986); *State* v. *Mason,* 186 Conn. 574, 585–86, 442 A.2d 1335 (1982); *State* v. *Greene,* 11 Conn. App. 575, 581, 528 A.2d 855, cert. denied, 205 Conn. 804, 531 A.2d 938 (1987). If the instructional error is constitutional, the state has the appellate burden of establishing that there is *no reasonable possibility* that the jury was misled. *State* v. *Shifflet,* supra; *State* v. *Mason,* supra; *State* v. *Greene,* supra. In either situation, the inquiry focuses on the degree of likelihood that the error influenced the jury. *State* v. *Shifflett,* supra. Thus, our Supreme Court and this court have routinely applied to federal constitutional instructional errors the standard of whether there is a reasonable possibility that the jury was misled in rendering its verdict.

We have, however, applied a somewhat different standard of harmlessness to noninstructional federal constitutional errors, namely, whether the state met its appellate burden of establishing that on the whole record the error was *harmless beyond a reasonable doubt. State* v. *Hoeplinger,* 206 Conn. 278, 294–95, 537 A.2d 1010 (1988); *State* v. *Silano,* 204 Conn. 769, 781–82, 529 A.2d 1283 (1987); *State* v. *Douglas,* 10 Conn. App. 103, 118, 522 A.2d 302 (1987). Thus, we have been applying a bifurcated standard of harmlessness to federal constitutional errors: for instructional errors, whether it is reasonably possible that the jury was misled; for noninstructional errors, whether the record as a whole establishes that the error was harmless beyond a reasonable doubt. Examination of recent precedents, including United States Supreme Court cases which control the harmless error analysis of federal constitutional errors, leads us to conclude that this bifurcation is not proper, and that the proper harmless error standard applicable to federal constitutional errors—instructional and noninstructional alike—is whether " 'the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " *Rose* v. *Clark,* 478 U.S. 570, 576, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986), quoting *Delaware* v. *Van Arsdall,* 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

It has long been firmly established that the harmless error standard applicable to a federal constitutional error is itself a matter of federal, not state, constitutional law. *Chapman* v. *California,* 386 U.S. 18, 21, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). It is also well established that "[w]hen a state court confronts a question of federal constitutional law 'it may not impose . . . greater restrictions as a matter of *federal constitutional law* when [the United States Supreme] Court specifi-

cally refrains from imposing them.' (Emphasis in original.) *Oregon* v. *Hass,* 420 U.S. 714, 719, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975)." *State* v. *Perez,* 10 Conn. App. 279, 287 n.6, 523 A.2d 508, cert. denied, 203 Conn. 810, 525 A.2d 524 (1987). Thus, in applying the harmless error test to a federal constitutional error, we are constitutionally required to apply that test as articulated by the United States Supreme Court. *State* v. *Perez,* supra. This court has recognized these principles in the context of the so-called *Rodgers*-type instructional error. Id., 285–90; *State* v. *Butler,* 11 Conn. App. 673, 679, 529 A.2d 219, cert. denied, 205 Conn. 806, 531 A.2d 938 (1987); see *State* v. *Rodgers,* 198 Conn. 53, 502 A.2d 360 (1985).

In *Chapman* v. *California,* supra, 24, the court held "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." In doing so, the court specifically departed from its previously articulated standard, which derived from *Fahy* v. *Connecticut,* 375 U.S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963), namely, " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman* v. *California,* supra, 23, quoting *Fahy* v. *Connecticut,* supra, 86–87.[11] Our Supreme Court recently applied the *Chapman* test to a federal constitutional noninstructional error by focusing on whether there was independent overwhelm-

---

[11] In articulating the new standard, the *Chapman* court recognized, however, that "[t]here is little, if any, difference between our statement in *Fahy* v. *Connecticut,* [375 U.S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963)] about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Chapman* v. *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The court also recognized that in fashioning a new standard, it did "no more than adhere to the meaning of . . . *Fahy* . . . . " Id. Thus, although in any

ing evidence of guilt; *State* v. *Hoeplinger,* supra (*Miranda* violation); and by examining the procedural and instructional context of the error. *State* v. *Walker,* 206 Conn. 300, 313, 537 A.2d 1021 (1988) (indirect prosecutorial comment on defendant's failure to testify); *State* v. *Silano,* supra (*Doyle* violation, where prosecutor asked the defendant about his silence after interrogation).

In *Rose* v. *Clark,* supra, the United States Supreme Court held that "the harmless error standard of *Chapman* v. *California,* [supra], applies to jury instructions that violate the principles of *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), and *Francis* v. *Franklin,* 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985)." *Rose* v. *Clark,* supra, 572. The court made clear that, except for certain exceptions not applicable here, the *Chapman* standard applies to instructional as well as noninstructional federal constitutional errors. Id. In doing so, the court emphasized that the " 'harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' " Id., 577, quoting *Delaware* v. *Van Arsdall,* supra, 681. The *Chapman* harmless error standard, reaffirmed and applied to instructional error in *Rose* v. *Clark,* supra, 576, quoting *Delaware* v. *Van Arsdall,* supra, 681, is whether, " 'on the whole record . . . the error . . . [is] harmless beyond a reasonable doubt.' " In

given case there may not be a practical difference in the result achieved by applying the "no reasonable possibility standard" and the result achieved by applying the "harmless beyond a reasonable doubt on the whole record" standard, it is important that we reach that result by the proper, constitutionally mandated standard. See also *State* v. *Hufford,* 205 Conn. 386, 408–409, 533 A.2d 866 (1987) (equating reasonable possibility standard with harmless beyond reasonable doubt standard).

determining whether an instructional error is harmless, the focus is not only on the language of the erroneous charge, but on the evidence and on the trial's factfinding process; such an error is harmless if the reviewing court is satisfied beyond a reasonable doubt that it did not contribute to the verdict. *Rose* v. *Clark,* supra, 577; see *State* v. *Perez,* supra, 290.

It is self-evident that jury instructions are neither delivered nor heard in a vacuum. They are delivered and heard in the context of the entire charge of the court, and they are intended to apply to, and are heard by the jury with reference to, the evidence in the case. Moreover, the evidence in a case is not considered by the jury in a vacuum. The jury evaluates it informed by the instructions of the court. Application of the *Rose* and *Chapman* harmless error doctrine, which requires that we evaluate the entire record, also requires, therefore, that we consider the erroneous instruction taken both in the context of the entire charge, and in the context of the factual record developed at the trial. This evaluation convinces us beyond a reasonable doubt that the court's instructional error in this case did not contribute to the verdict.

As we have explained above, the problem with the erroneous instruction here is that it permitted the jury to use its disbelief of the defendant's testimony directly to conclude that the defendant was the perpetrator of the crime, or to use that disbelief directly to supplant any reasonable doubt it may have had regarding the identity of the defendant as the perpetrator. Thus, the risk created by the instruction is that the jury might not undertake a proper evaluation of the only evidence in the case bearing directly on the issue of the defendant's identity as the perpetrator, namely, the victim's direct identification testimony and any circumstantial evidence bearing on that issue, and that the jury's determination of that issue might, therefore, be skewed.

We conclude beyond a reasonable doubt, however, that this risk did not materialize because it was significantly mitigated by the court's other instructions, and because the evidence of identity was overwhelming. Thus, the error did not contribute to the verdict.

The erroneous instruction was given in the context of a charge which in other closely related respects significantly mitigated the error by specifically directing the jury's attention to the factors properly bearing on the issue of identity. " 'An erroneous instruction, even of constitutional dimension, is harmless if, viewed in the context of the charge as a whole,' " it did not contribute to the verdict. *State* v. *Cobb,* 199 Conn. 322, 325, 507 A.2d 457 (1986), quoting *State* v. *Carrione,* 188 Conn. 681, 685, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed 2d 347 (1983). The court numerous times emphasized to the jury that it was the state's burden to prove guilt beyond a reasonable doubt, including specifically the state's burden to establish beyond a reasonable doubt that the defendant was the perpetrator. The court emphasized that the "[s]tate has the burden to prove that the defendant was the very same person who committed the crimes as charged. The matter of identification of an assailant by the complainant is of importance in this case, and must be considered in light of the defendant's testimony and his denial of the crime." In this connection, the court specifically directed the jury's attention to the victim's identification testimony, and charged that her eyewitness testimony "should be carefully examined to assure its accuracy." The court charged further that in evaluating her identification of the defendant, the jury should consider her opportunity to identify the perpetrator at the time of the crime, her emotional state at the time of the crime and at the time of her out-of-court identification, the degree of attention she paid to her assailant, the degree of accuracy of her prior

description of her assailant, the time period between the crime and her identification of the defendant, and her level of certainty in identifying the defendant. Also, in giving the erroneous portion of its charge, the court did not emphasize its error by specifically referring to the content of the defendant's testimony.

It is clear from this record that the jury's verdict had to rest essentially on its belief of the victim's testimony identifying the defendant as her assailant, and its corresponding disbelief of the defendant's alibi evidence. In short, the jury either believed that the victim's identification of the defendant was accurate, or it believed the defendant. Indeed, both counsel argued the case to the jury as one primarily involving the question of the credibility of the victim and the defendant. Under these circumstances, we are convinced that the error in the charge, namely, that the jury might also have improperly used its disbelief of the defendant's testimony, did not contribute to the verdict.

In this connection, we note that the defendant took no exception to the court's instruction. We have repeatedly noted that such a failure sends a powerful signal that because of the posture of the case the defendant's counsel, who was in the courtroom when the instruction was delivered, did not hear the error in the harmful way which he presses on appeal. *State* v. *Williams,* 204 Conn. 523, 533, 529 A.2d 653 (1987); *State* v. *Scott,* 11 Conn. App. 102, 122, 525 A.2d 1364, cert. denied, 204 Conn. 811, 528 A.2d 1157 (1987); *State* v. *Huff,* 10 Conn. App. 330, 333, 523 A.2d 906, cert. denied, 203 Conn. 809, 525 A.2d 523 (1987). This is the rationale for the principle that it is a rare case where an improper instruction, not objected to in the trial court, will justify a reversal of a conviction. *State* v. *Kurvin,* 186 Conn. 555, 563–64, 442 A.2d 1327 (1982).

Furthermore, the factual record developed at the trial demonstrates overwhelming evidence of guilt. " '[V]irtually no other crime offers the opportunity for observation of the perpetrator as the crime of [sexual assault.]' " *State* v. *Williamson,* 206 Conn. 685, 693, 539 A.2d 561 (1988), quoting *State* v. *Amarillo,* 198 Conn. 285, 294, 503 A.2d 146 (1986). The victim spent approximately twenty minutes with the unmasked defendant in the afternoon in her well lit apartment, and during that time made a conscious effort to fix his face and appearance in her mind. She positively and repeatedly identified him on the street near her apartment a very short time after the crime, and repeated that positive identification at trial. There was very strong circumstantial evidence corroborating her testimony, particularly the match of the defendant's unusual lacing of his left sneaker when he was arrested with that of the assailant. There was also the corroboration supplied by the defendant's jacket, pants, identification card, can opener and money in his pockets, and the gloves he carried in the plastic bag. In addition, there was evidence of his consciousness of guilt in holding the flowers up to his face upon seeing the victim and the police officer, and in turning abruptly away from them in a direction opposite to the direction of his girlfriend's house, where he testified he was going.

We recognize that in *State* v. *Hoeplinger,* 206 Conn. 278, 298, 537 A.2d 1010 (1988), the court considered as one factor in its harmless error analysis the fact that the jury asked to rehear the defendant's testimony, and that the jury in this case asked to rehear the defendant's testimony regarding his alibi. The record in this case indicates that the court completed its instructions at 3:10 p.m. At some time between then and 3:50 p.m., the defendant's alibi testimony was read to the jury, after which the jury resumed its deliberations until it was excused at the end of the court day. At 11 a.m. the next day, the jury returned its verdict.

*Hoeplinger* is distinguishable, however. In *Hoeplinger,* the issue was whether an improperly admitted statement of the defendant contributed to the verdict because it "seriously undermined, if not effectively devastated," his credibility. Id. The jury never should have heard the improperly admitted statement at all, and thus its request to rehear the defendant's testimony, which was seriously undermined by that statement, indicated that the error in admitting the statement could not be considered harmless beyond a reasonable doubt.

In the present case, however, there was no such improperly admitted evidence. The trial court had properly instructed the jury that the issue of identification "must be considered in light of the defendant's testimony and his denial of the crime." Thus, the jury's request to rehear his alibi testimony indicates no more than its scrupulous adherence to this instruction. There is no suggestion in this record that the jury's request indicated an improper use of that testimony.

### III

The defendant's final claim, which we must consider because, if successful, it would require a judgment of acquittal on the burglary and robbery charges; *State* v. *McIntosh,* 12 Conn. App. 179, 187 n.3, 530 A.2d 191, cert. denied, 205 Conn. 808, 532 A.2d 77 (1987); is that the evidence was insufficient regarding the element that the defendant was armed with, and used or threatened the use of, a dangerous instrument. See footnotes 1 and 2, supra. The defendant's argument is premised on the fact that no knife was found on the defendant, and on the claim that the can opener could not be considered a dangerous instrument. This argument is without merit.

A dangerous instrument is defined in pertinent part as "any instrument, article or substance which, under

the circumstances in which it is used or attempted or threatened to be used, is capable of causing serious physical injury . . ." General Statutes § 53a-3 (7). "The question is whether the instrument possessed the potential for causing either death or serious physical injury under the circumstances in which it is used [or threatened to be used]." *State* v. *Frazier,* 7 Conn. App. 27, 39, 507 A.2d 509 (1986). Serious physical injury is defined as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ." General Statutes § 53a-3 (4).

The victim testified that the defendant held and pressed to her skin a shiny metal object, that he told her was a knife and that she thought was a knife. He also threatened to cut and blind her with that object. The jury could have inferred that it was in fact a knife. Furthermore, any metal object handled in the manner that this object was used and threatened to be used by the defendant could be considered a dangerous instrument. Certainly a rational jury could therefore find that it was an article that, under the circumstances in which it was used and threatened to be used, was capable of causing serious disfigurement, impairment of health or impairment of the function of a bodily organ.

There is no error.

In this opinion the other judges concurred.