[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION Motion To Reopen And Modify, Post Judgment
The parties in this case, Maureen J. Kahn, plaintiff, and David B. Lacoss, defendant, are before this court yet again consequent to the dissolution of their marriage on October 1, 1998 by this court. That dissolution judgment was entered after a contested trial held on September 15 and 16, 1998.
The October 1, 1998 decree required the defendant to pay the plaintiff $150.00 per week alimony. See Memorandum of Decision, October 1, 1998, page 13. [128] That order is the focus of the present motion of the defendant. See Motion To Reopen And Modify, Post Judgment, April 4, 2000. [159]
Defendant's motion is based on C.G.S. § 46b-86(b). It states:
"In an action for divorce, dissolution of marriage, legal separation or annulment brought by a husband or wife, in which a final judgment has been entered providing for the payment of periodic alimony by one party to the other, the Superior Court may, in its discretion and upon notice and hearing, modify such judgment and suspend, reduce or terminate the payment of periodic alimony upon a showing that the party receiving the periodic alimony is living with another person under circumstances which the court finds should CT Page 10441 result in the modification, suspension, reduction or termination of alimony because the living arrangements cause such a change of circumstances as to alter the financial needs of that party." C.G.S. § 46b-86(b).
There are two primary fact issues before the court: (1.) Is the plaintiff Khan living with another person? (2.) If so, have her living arrangements with the person caused a change of her financial needs?
In connection with the dissolution decree, the court wrote a lengthy memorandum of decision setting forth factors upon which its orders were based. Memorandum of Decision, October 1, 1998, p. 18. [128] Many of the findings and conclusions set forth in the October 1, 1998 memorandum of decision are pertinent to the issues now before the court.
The parties were married on November 26, 1983. As of the time of the dissolution they had been married almost 15 years. Plaintiff was then 38; defendant 41. They had two sons, Matthew, then 17 1/2, and Jonathan, then 15 1/2.
The plaintiff at the age of 10 lost her right lower leg due to cancer. She suffered a multiple of serious health problems and has "long-term medical needs." 3, 4. She was not employed. 4. Her prospects for employment were few. 11. For social security purposes, she was deemed totally disabled. 4. She did receive monthly social security disability payments; in 1997, these totaled $6,129.60.
Among the court's findings regarding plaintiff's health are the following: "Plaintiff feels pressure on her internal organs and resultant pain." 3. "The Plaintiff began wearing a full body brace in January 1998." 4.
As of the time of the dissolution, the parties jointly owned a residential property known as 587 Vauxhall Street Extension, Waterford. It was the family home. It had "been appraised at $138,000." 5. It had been "refinanced twice to pay debts and obligations." 6. "Refinancing proceeds from mortgage rewrites on Vauxhall St. paid for a remodeled kitchen, a pool, a deck and remodeled bedrooms." 9. There were three mortgages on the property. 8. None "[were] currently being paid" as of the trial. 9. The mortgage balances were $97,926, $2,246, and $11,998. 8, 10. The equity of the parties was only $25,830 based on the appraised value of $138,000. 10. The first mortgage was in default; $2,622 was required to cure that default. 5. The first mortgagee bank "has given notice of default and foreclosure proceedings are in the offing." 5. "The spectre of foreclosure and/or bankruptcy looms large." 10. Plaintiff's father "is willing to assist his daughter financially insofar as the CT Page 10442 Vauxhall St. property is concerned." 7.
The plaintiff owned two cottages at Arrowhead Cove in Salem. They "are free and clear of any encumbrances." 8. They "were purchased five or six years ago for $23,000." 8. The defendant did considerable remodeling to the two cottages at Arrowhead Cove including plumbing, new wiring and sheetrock. 8. In September 1998, plaintiff's appraisal valued the cottages at $10,000. 5. An appraisal submitted by the defendant valued the property at $27,000. 6.
"In 1997, the earnings of the Defendant at Electric Boat were $43,322.00 gross, $41,722.00." 6. "The Defendant's current weekly gross income is $690.98 and a weekly net of $540.75." 10. "The Defendant, as representative payee, receives $130.00 monthly for each boy, total $260.00, from Social Security." 7. These are apparently due because of plaintiff's disability status.
The court sets forth in summary fashion the terms of the dissolution judgment it deems pertinent to the instant motion.
The marriage was dissolved. 18. Plaintiff's maiden name of Maureen J. Khan was restored. "The Defendant shall pay the Plaintiff periodic alimony of $150.00 a week" until the Plaintiff's remarriage or death." 13, 14.
The parties were granted joint legal custody of their two sons. Defendant was made the primary custodial parent. 12. Defendant was made responsible for all of the boys' medical and dental expenses. 13. Plaintiff was excused from paying any support for the boys. 13. Plaintiff was allowed reasonable and liberal visitation. 14. "The children shall be encouraged to spend time with their mother." 14.
In addition to the $150 weekly periodic alimony, defendant was ordered to "provide health insurance for the Plaintiff as available through Cobra for three years" at defendant's expense. 13. The plaintiff was awarded 1/2 of that portion of the defendant's pension which accrued during the years of the marriage. 16. Plaintiff was awarded "50 percent of the value of the Defendant's SSIP and the Defendant's 401k plan, both to be valued as of the date of the parties dissolution."
The plaintiff was permitted to retain her interest in the two Arrowhead Cove cottages. 15.
Regarding the former marital home (Vauxhall St.), the court ordered and remarked:
CT Page 10443 "The Defendant shall convey all of his rights, title and interest in and to the real estate known as 587 Vauxhall Street Ext., Waterford to the Plaintiff by appropriate deed.
 "The Defendant shall have 60 days from and after the conveyance to seek other accommodations for himself and the minor children.
 "The Defendant shall be responsible for all expenses at the Vauxhall St. property until he vacates the same.
 "The Plaintiff, after transfer, shall be responsible for all expenses including the three mortgages and hold the Defendant harmless therefrom.
 "The Court enters this order in part mindful of the representation of the Plaintiff's father that he will assist her financially in order to save the property from foreclosure and to try and preserve the home for herself and for a proper place for visitation with the children.
 * * * "At such time as the Defendant vacates the Vauxhall St. property however, he shall leave said premises sufficiently furnished to permit occupancy by the Plaintiff, including telephone, with design for person with disability, entertainment center, small TV, VCR, bedroom set, photographs, camera, exercise equipment."
 * * * "In structuring these orders, the Court is only too well aware of the overall difficult financial situation, the prospect of foreclosure on the home, the necessity for a stable home environment for the minor boys, the lack of substantial capital assets to resort to and the medical and physical problems of the Plaintiff.
 * * * CT Page 10444 "It may be that the Vauxhall St. property will be lost in foreclosure, but the Court wants the Plaintiff to have the chance to salvage it, if possible, with her family's help."
Memorandum of Decision, October 1, 1998, pp. 14, 15, 17. [128]
The court, in the end, remarked, perhaps lamented: "The assets and resources available to the Court in trying to fashion reasonable orders have been meagre." Id., 18.
By any fair reckoning, the decree did not treat the plaintiff illy. Plaintiff's counsel during the dissolution wrote: "In whole I believe the Court's judgment is most favorable to you." Memorandum of Decision On Plaintiff's Five Motions For Contempt All Dated March 1, 1999, April 9, 1999 filed (April 12, 1999), p. 6. [148]
Nevertheless, the plaintiff filed an appeal from the judgment. The appeal was recently denied. Kahn-Lacoss v. Lacoss, 58 Conn. App. 905 (Per curiam.) (June 6, 2000).
The two primary issues in this case (see page 2 above) are issues of a fact. "Whether an individual `is living with another person' is a fact specific determination." D'Ascanio v. D'Ascanio, 237 Conn. 481, 486
(1996). Necessarily, determination of this fact issue is largely dependant on credibility. Because of the circumstances of this case, this means the credibility of the plaintiff is critical to the resolution of this case. For a variety of reasons, some of which will be obvious from the discussion below, the court concludes the credibility of the plaintiff is wanting.
The court saw and heard the plaintiff testify. Her testimony was frequently unresponsive and evasive. Her seething anger towards the defendant was all to obvious. On more than one occasion, she made uncalled for remarks to disparage the defendant. The court has the distinct impression that her anger and desire to preserve her alimony caused her to shade, embellish, and/or disregard the truth when she thought it was in her interest.
Defendant claims plaintiff is living with John Hillyer.
John Hillyer lives at 33 Norman Street, Waterford. [60]
When asked directly where she was living, plaintiff responded: "587 Vauxhall Street Extension." 5. CT Page 10445
The court finds that plaintiff is not living at 587 Vauxhall Street Extension.
Plaintiff and Hillyer have a child. [61] The child was born on March 10, 1999. Plaintiff was pregnant with this child during the dissolution trial on September 15 and 16, 1998 which led to the October 1, 1998 dissolution judgment.
In the dissolution trial, plaintiff amply detailed her extended medical situation. It inured to her benefit. However, plaintiff did not inform the dissolution court that she was pregnant then with another man's child. Perhaps the pregnancy contributed to "[p]laintiff['s] feel[ing] pressure on her internal organs and resultant pain." Plaintiff's extensive medical situation was disclosed to the trial court, the pregnancy was not. 3. This reflects poorly on her candor. In the hearing on the present motion, plaintiff testified she was not pregnant at the time of the dissolution trial. 15. When pressed, she then testified that as of the time of the dissolution trial, she did not know she was pregnant. 15, 16, 29. The child was born on March 10, 1999. 15. She claims he was born at 34 weeks. 16. Even if this be accepted as true, which the court does not, she was at the least over two months pregnant during the dissolution trial held on September 1988. She claims she did not know she was pregnant until she went into labor. She was 38; she was not nulliparous. She was pregnant at the time of the dissolution trial. The court does not accept plaintiff's claim that she did not know then she was pregnant.
Plaintiff testified that Hillyer tries to see the child every day. 17. Hillyer is "actively involved in the child's life." [61]. When asked where the child sleeps, plaintiff stated: "He sleeps at my house, or at his (Hillyer's) house, or wherever I am staying." 17. When asked where she stayed the most, plaintiff said: "On and off with my parents and with Norman Street [sic] and, also, Arrowhead Cove back a while ago. And I've had other friends." 29. The child has his own bedroom at Hillyer's residence, 33 Norman Street. 64. Hillyer "buy[s] him clothes and food and anything that he may need." 62. Hillyer testified the child lives with him part of the time and part of the time with the plaintiff. 62. And, again according to Hillyer, only part of the time the child is with Hillyer is plaintiff with them at 33 Norman Street. 62.
As of the hearing on the motion, May 22, 2000, the child was only 14 1/2 months. During the time plaintiff claims she was living at Vauxhall Street, since the Fall of 1999, he was perhaps six months old and no more than 14 1/2 months as of the date of the hearing on the motion, May 22, 2000. Without attributing more than a modicum of maternal instincts and qualities to the plaintiff, the court does not believe the plaintiff either left the child alone with Hillyer on the numerous days she says CT Page 10446 she did not stay at Norman Street or took the child on her nomadic stays away from Norman Street.
In the dissolution decree, plaintiff was awarded the family home (Vauxhall or Vauxhall Street). The court found it was worth $130,000 and there was then (September 1998) an equity of $25,000. Plaintiff's affidavit filed at the time of trial showed plaintiff believed the property was worth $140,000. The court awarded the property to the plaintiff so she could have "a stable home environment for the minor boys" to visit. The court stated:
 "The Court enters this order in part mindful of the representation of the Plaintiff's father that he will assist her financially in order to save the property from foreclosure and to try and preserve the home for herself and for a proper place for visitation with the children." See p. 6, above.
At the time of dissolution there was an equity of $25,000 in the Vauxhall Street property. The trial court recognized that saving the property from foreclosure would be difficult but with help from her father, it might be feasible to save the property. The court found the equity in the property was then $25,000.
More recently there has, according to plaintiff's affidavits, been a precipitous decline in the value of the property.
As noted, at the dissolution trial plaintiff represented the property was worth $140,000. Since the dissolution, plaintiff has filed several affidavits with the court. On February 1, 1999, the plaintiff represented to the court the property was worth $140,000.00. Financial Affidavit (JD-FM-6). [137] On February 11, 1999, plaintiff represented the value was $130,000.00. Application For Waiver of Fees/Appointment of Counsel. [140] On May 3, 1999 plaintiff represented the property was worth $130,000. [150] On June 22, 1999 she represented the value to be $130,000.00. Application for Waiver of Fees/Appointment of Counsel, 6-22-99. [152] In her affidavit submitted at the time of the court's May 22, 2000 hearing on the modification motion, she represented the value of the property was $100,000.00. She reported the debt on the property was $130,000.00. Thus, according to her representations, there was a "negative equity" of $30,000.00.
The property is being foreclosed by the first mortgagee. Twice, plaintiff has filed bankruptcy petitions in order to stay the foreclosure. As of the time of the dissolution trial, September 1998, $2,622.00 was needed in order to bring that mortgage current. There is no CT Page 10447 evidence that any payments have been made since September 1998. Plaintiff has not made any since April of 1997. In order to bring the mortgage current, far more than $2,600.00 would be needed. And, there is no evidence the mortgagee would permit such a redemption at this point. And, as of the time of the dissolution, the plaintiff's father was willing to help her save the property, there then being an equity of $25,000.00. There is no evidence that he is still willing to do so. It would be most unusual if he would advance monies to pay off a mortgage debt on a property which, by virtue of the mortgages is "$30,000.00 under water." Plaintiff's efforts via the bankruptcy proceedings will not lessen the amount needed to redeem the property. The bankruptcy filings enable plaintiff to remain in possession longer. At best, bankruptcy would make that part of the debt which exceeds the value of the property unsecured and thus perhaps dischargeable in bankruptcy. The bankruptcy machinations will not reduce the amount required to redeem the property; to redeem — save — the property plaintiff will have to pay the full amount of the debts owed on the mortgage being foreclosed. She has not offered any evidence to the contrary or that anyone of the mortgagees was willing to compromise any of the debts.
While there is no evidence on this point, plaintiff says "[t]he mortgage holder at this point will not accept anything by [sic] full payment of the arrearage." Post Trial Memorandum of Plaintiff, June 12, 2000, p. 3. As of September-October 1998, the arrearage or amount necessary to reinstate just the first mortgage was $2,622. No payments have been made since. Plaintiff's affidavit shows the weekly mortgage cost is $279.07. Since October 1, 1998 to the date of the hearing on May 22, 2000, approximately 86 weeks have elapsed. Thus, the arrearage for this period alone is in the order of $24,000. The arrearage as of October 1, 1998, $2,622; the arrearage accrued during the 86 weeks, $24,000; municipal property taxes at the rate of $34.88 at least for the 86 weeks, $3,000; further attorney's fees due to the extended foreclosure proceedings and the intervening bankruptcies, and court costs surely bring the amount necessary to reinstate to well over $30,000.
The evidence does not show that plaintiff has the means, even if she were so inclined, to bring the mortgage current to save the property. There is no evidence in this proceeding that her father or anyone else is ready to step up and help her "save" the property.
Plaintiff acknowledged her prospects for "saving" the property were tenuous. When asked about homeowners insurance payments, plaintiff stated: "No. Cause I only pay that every couple of months because I don't know how long I'll be in the home. I might be homeless soon." 24.
Moreover, Hillyer testified "that he pays all the bills" at 33 Norman CT Page 10448 Street, i.e., the mortgage, taxes, insurance, utilities, etc. 63-68. Plaintiff does not contribute anything towards the household expenses at 33 Norman Street. 18, 69. Plaintiff lives there with none of the "roof over her head" expenses she would have living at Vauxhall Street.
There is a computer at 33 Norman Street which plaintiff uses. Hillyer uses it but rarely. Plaintiff pays the cost of the computer service for the computer at 33 Norman Street. 65.
Plaintiff is not an unintelligent woman. Therefore, the court does not believe the plaintiff is trying to save the Vauxhall Street property. It -makes no sense financially.
Rational people usually have some reason for their acts. Plaintiff has not even suggested a reason for her claimed frequent staying, meanderings, at various places rather than Norman Street or Vauxhall Street. No reason has been advanced for her not living at Hillyer's where her child has a bedroom on a steady basis. No good reason appears for her frequent uprooting of this child away from familiar surroundings. Should the court assume there is none? There is a reason why she does not stay at Vauxhall Street. She has chosen not to do so. And, the court finds it quite telling that when asked where she stayed the most, plaintiff testified: "On and off with my parents and with Norman Street [sic] and, also Arrowhead Cove back a while ago. And I've had other friends." 29. Why didn't she include Vauxhall Street if she had been living there since the Fall of 1999?
There is further evidence from plaintiff that leads to the conclusion that she is not living at Vauxhall Street. When asked how long she had been residing at Vauxhall Street, plaintiff answered: "Well, since the home was made liveable again, approximately Fall, on and off. It's just — I'm unable to get it back to presentable position." 5. This court found that Vauxhall Street was liveable in April 1999. Memorandum of Decision On Plaintiff's Five Motions For Contempt Dated March 1, 1999, April 9, 1999 (filed April 12, 1999), pp. 4-6. [148] The court does not believe plaintiff was "staying" at Vauxhall Street even "on and off." No corroborating testimony came from any of the persons with whom plaintiff claims she frequently stayed, i.e., her parents, friends, etc. There is no credible evidence of even one overnight stay away from 33 Norman Street.
Since the dissolution judgment, plaintiff has filed numerous motions for contempt and the like claiming the defendant had not obeyed the judgment. [130, 133, 134, 136, 142, 143, 144, 145, 146] Five motions for contempt were filed on March 1, 1999 alone. [142, 143, 144, 145, 146] The court heard and decided these five motions. One motion claimed "[t]he CT Page 10449 Defendant did not leave the premises at 587 Vauxhall Street, Waterford in an acceptable condition when he vacated the premises on February 14, 1999 and damaged the same on vacating." Memorandum of Decision On Plaintiff's Five Motions For Contempt All Dated March 1, 1999, April 9, 1999 filed (April 12, 1999), p. 1. [148]
In the dissolution judgment, defendant was ordered:
 "At such time as the Defendant vacates the Vauxhall St. property however, he shall leave said premises sufficiently furnished to permit occupancy by the Plaintiff, including telephone, with design for person with disability, entertainment center, small TV, VCR, bedroom set, photographs, camera, exercise equipment." See page 6, above.
Plaintiff did not claim defendant had not complied with this provision of the judgment. However, this court has found that defendant did leave those items required by the dissolution judgment. Memorandum of Decision On Plaintiff's Five Motions For Contempt Dated March 1, 1999, April 9, 1999 (filed April 12, 1999), p. 5. [148]
The court found:
 "The premises were vacated in accordance with the order of Mihalakos, J., without being damaged.
 "The Defendant left the specified items of personalty at the residence when vacating in accordance with the order of the Court.
 * * * "plaintiff's Exhibit 12 statement by appraiser Wheeler characterizes the physical condition of the premises as due to deferred maintenance.
 "Out of the 106 photographs submitted by the Plaintiff, see Plaintiff's Exhibits 3 and 4, only several show any litter or debris and only two show any danger to a door and the front of an appliance.
"The remaining photos show a home and property in basically proper condition with admittedly a need for cosmetic decoration. CT Page 10450
 * * * "In reviewing the testimony and exhibits the Court finds . . . that when the Defendant vacated the premises at 587 Vauxhall Street that the premises were not damaged or vandalized."
Memorandum Of Decision On Plaintiff's Five Motions For Contempt All Dated March 1, 1999, April 9, 1999 filed (April 12, 1999), pp. 5-7. [148]
Thus, as of April 12, 1999, there is a judicial determination that the Vauxhall Street property was in "basically proper condition" and defendant "left the specified items of personalty" which the court had ordered so that it was "sufficiently furnished to permit occupancy by the Plaintiff."
And yet plaintiff claims she started staying at Vauxhall Street in the late Fall of 1999. Is this because defendant filed a motion to terminate the alimony because plaintiff was living "with another person? Motion To Reopen And Modify, Post Judgment, November 24, 1999. [153]
Plaintiff's immediate response to defendant's November 24, 1999 motion to terminate alimony because plaintiff was living with another person was her "Motion To Deny Reopen And Modify, Post Judgment While Appeal Pending In Hartford," December 3, 1999. [154] In that motion, plaintiff "respectfully request[ed] that the Motion to Reopen and Modify, Post Judgment, brought about by Defendant . . . be tabled Id., 3. Plaintiff recites therein:
"3. That since the date of Judgement [sic], the living arrangements of plaintiff were forced upon her due to the transfer of the home she paid for with her Social Security disability from August 1982 until April 1996 due to the home being vacated after `exclusive rights' were granted to Defendant the whole period until February 14, 1999 and Defendant was to keep his debts on his financial affidavit current, and as his own attorney conveyed to plaintiff's attorney at the time, they knew he was supposed to keep the mortgage current, see evidence file and attached letter from Attorney Robert Cary to Attorney Terrance Real. And said living arrangements are not the issue here, Plaintiff still retains her 587 Vauxhall St. Ext. Property, has her parents home at 903 Hartford Turnpike, and retains her mailing address of P.O. Box 212, Quaker Hill, Ct 06375. plaintiff maintains that Defendant has been served CT Page 10451 several times while cohabiting with his girlfriend all through the divorce proceedings at 964 Voluntown Road, Griswold, CT while the minor children resided alone at Both the 587 Vauxhall St. address in Waterford and had witnesses to prove such, and at their new residence at 15 Preston Rd. in Voluntown. Motion To Deny Reopen And Modify, Post Judgment While Appeal Pending In Hartford," December 3, 1999. [154]
Since this motion of plaintiff came on the heels of and in direct response to defendant's November 24, 1999 motion contending plaintiff was living with another person, the plaintiff's statement that the "living arrangements of Plaintiff were forced upon her" must mean her living with John Hillyer at 33 Norman Street, Waterford. Thus, plaintiff did not deny she was living with Hillyer, tacitly admits she was, and does not say she is living at Vauxhall Street, but only she "still retains her 587 Vauxhall St. Ext. Property." Id., p. 1.
The court is convinced that plaintiff has not lived at the Vauxhall Street property since the October 1, 1998 dissolution.
Although the plaintiff denies it, the court is convinced that plaintiff has been living with John Hillyer at 33 Norman Street, Waterford. The court would be on shaky ground if it found plaintiff was living with Hillyer solely because the court did not believe her denial that she was living with Hillyer. A trier of fact "may reject a witness' testimony, it may not conclude from that rejection that the opposite is true. State v.Hart, 221 Conn. 595, 605 (1992); State v. Carter, 196 Conn. 36, 50
(1985); State v. Alfonso, 195 Conn. 624, 634 (1985); Novak v. Anderson,178 Conn. 506, 508 (1979); State v. Coleman, supra, [14 Conn. App. 657,] 671-78 [(1988); cert. denied; 208 Conn. 815 (1988)]; and, State v.Gainer, 51 Conn. App. 563, 574 (1999).
Defendant had a private investigator conduct an investigation "to establish where she [plaintiff] was living." 35, 38. During the period October 24 to November 7, 1999, the investigator saw plaintiff's van parked in the driveway at 33 Norman Street on 13 occasions on eight separate days. These observations were usually late at night, i.e., 11:00 o'clock or later and early in the morning, i.e., between 6 and 7 a.m. Most times the observation included one late at night followed by an observation early the very next morning. 36-37, Exhibit 6. These indicate an overnight stay. Plaintiff never denied she was at 33 Norman Street at the times her van was reported to have been in the driveway. Her counsel did not ask her if she were there at those times.
The investigator also talked with plaintiff inside 33 Norman Street. CT Page 10452 The investigator testified: "She [plaintiff] had a young infant and there were a lot of children's things, a lot of pictures, a playpen, crib, kids clothes — that kind of thing that I observed in the living room." 37.
On very brief cross examination, plaintiff made no attempt to challenge the investigators's testimony or her observations. Plaintiff only established that the investigator had not seen the plaintiff herself at 33 Norman Street on the numerous occasions her van was seen there. 40.
The court accepts the investigator's testimony as true and finds the subject of her reported observations as fact.
The parties' older son, Matthew, testified. 42-55. He had frequently stopped at his mother's house before he went to work in the morning. This was at Norman Street. "She's come down from upstairs and everything, after getting out of the shower and things like that." 43. Asked if his mother had a bedroom there, he replied: "Um, yeah. It was John's bedroom." 43. He could recognize his mother's furniture and personal things. When asked if he saw them at Norman Street, he testified: "There's a stereo, a phone. I'm trying to think of what else was there." The court is mindful that the dissolution judgment ordered defendant to leave certain furniture, etc., at Vauxhall Street, including "telephone, with design for person with disability, entertainment center." 43.
Matthew had been to Norman Street at different times of the day. Except for one occasion, his mother was there. 44.
Matthew had been to Vauxhall Street during the time plaintiff claims she was living there (Vauxhall Street.) Asked to compare if there were more furniture there than when he, his brother and father had moved out, he said: "Yeah. There was a little more furniture, you know, but it was just scattered here and there. And, basically, like I walked into one — like one of the rooms had stuff piled — like clothes and stuff piled there, and there wasn't really any dressers or anything like that, you know. Q. Did you see a bed? A. Um, there was like mattress on the floor."
The Court, rather inartfully, asked Matthew about what he had seen at Vauxhall Street and Norman Street:
 THE COURT: Did your mother's and the baby's furnishings or stuff, if you will, were they at Norman Street?
THE WITNESS: Yeah . . . There was basic — CT Page 10453 there was some clothes and stuff like that. Like I said, like — but it basically looked like it was somewhere, like, for them to, you know, store stuff, you know. Cause it was just — there was a couple of chairs.
 There was, I think, a mattress in the one room, and there was . . ."
 Transcript of Proceedings, May 22, 2000, p. 49.
The court asked Matthew: "Why did you go to Vauxhall Street? He answered: "Um, basically, there was one time I popped in cause she said she was gonna be there and it was at night — during the night — after work one night. And then every other time it was she had to stop — stop there to do — I'm not sure what she had to do, you know, but we'd stop over there from Norman from Norman Street before we went out in the morning." Id., 49-50. "We'd stop over there from Norman Street" strongly suggests plaintiff was living at Norman Street, not at Vauxhall Street.
Plaintiff's cross examination was brief. 52-55. His motives for testifying were quite properly explored. 52-53. He clarified that he had been to Norman Street "quite a bit, probably fifteen, twenty times." 53.
It is significant that plaintiff did not challenge the fact content of Matthew's testimony. The accuracy or completeness of his observations were neither questioned nor impugned. Thus, for example, Matthew testified he had not seen a bed at Vauxhall Street but had seen a mattress on the floor. On cross examination, he was not asked if he had gone into all rooms of the house which, if he hadn't, might explain his not seeing a bed. Plaintiff chose not to even try to undermine his testimony; probably because she knew it was truthful and accurate. And, at no other point did plaintiff testify or present evidence to contradict Matthew's testimony.
The court accepts Matthew's testimony as true. The facts he testified to strongly call for a determination that plaintiff was living at 33 Norman Street and was not living at 587 Vauxhall Street.
The younger son, John, testified. 56-59. He was asked where. he had visited his mother over the last two years. He testified: "Um, a couple of other times she was at my grandparent's house, but three times that I remember, I went to her boyfriend's house and she was there. Q. Okay. So you believe John Hillyer to be your mother's boyfriend? A. Yes." 56. John did not say he had even seen his mother at Vauxhall Street. John is quite CT Page 10454 upset with his mother and blames her for the family breakdown. 56. He thinks the court's dissolution orders were unfair to his father. 58
The plaintiff produced no evidence to corroborate her claim that she was living at 587 Vauxhall Street. No neighbors of 587 Vauxhall Street were called to testify she was living there. No friends or relatives either. Apparently she claims she was trying to make 587 Vauxhall Street "presentable." However she produced no evidence to show any work being done to show progress on that score. No receipts for such work or canceled checks for such work. Her check register was reviewed and it does not show anything which might be for much work. Exhibit 4. No photographs were offered to show the change in condition she had accomplished so she could live there. No photographs were offered which would show that she was living at 587 Vauxhall Street. And, this the court recalls, is the same party who presented 106 photographs when she was attempting to show the condition of 587 Vauxhall Street in the Spring of 1999. The court believes that if plaintiff were really living at 587 Vauxhall Street, very little imagination and ingenuity would have brought forth evidence that she was living there. There was none.
Plaintiff was represented counsel who was more than able; he has experience in this type of case. He is not an alchemist. If there were evidence to establish the crucial facts here, i.e., plaintiff was not living with Hillyer at 33 Norman Street but in fact was living at 33 Vauxhall Street, surely he would have done so. No such evidence was presented. Plaintiff did not call any witnesses.
Similarly, no evidence was produced that she was not living at 33 Norman Street. And, even if plaintiff did occasionally stay at a place other than 33 Norman Street, it does not mean she was not living at 33 Norman Street.
Plaintiff and John Hillyer eat together at 33 Norman Street. They both contribute to the cost of their food. 70-72. There, they bed together. 69. They have a child. The child has his bedroom there. 64, 69. Plaintiff and Hillyer are both actively involved in his care.
From all that has been set forth above, the court has substantial, reliable, and convincing evidence upon which it finds that the plaintiff is living with another person, John Hillyer. They are living together at 33 Norman Street, Waterford.
The court must also decide whether plaintiff lives with John Hillyer "under circumstances which the court finds should result in the modification, suspension, reduction or termination of alimony because the living arrangements cause such a change of circumstances as to alter the CT Page 10455 financial needs of that party." C.G.S. § 46b-86(b).
The dissolution court clearly "hoped" that plaintiff could "save" 587 Vauxhall Street and live there. Vauxhall Street is lost, plaintiff has not lived there.
On her May 22, 2000 financial affidavit, plaintiff showed she had weekly expenses which totaled $554.88. Included in her weekly "expenses, she listed the following:
 Mortgage $279.07 Taxes 34.88 Fuel 40.90 Electricity 7.84 Telephone 10.33 Cable T.V. 8.91 Homeowners 10.14
$392.07
These "roof over the head" expenses relate to 587 Vauxhall Street. Both plaintiff and Hillyer testified she paid no such expenses for Norman Street. 18, 69.
Plaintiff testified she has not paid the mortgage. 19. Likewise she has not paid the taxes. 20. The mortgage ($279.07) and taxes ($34.88) which admittedly she doesn't pay amount to $313.95 per week.
The other claimed "roof over the head" expenses come to $74.02 per week. She will not have these expenses once the foreclosure is finalized.
Because plaintiff is living with John Hillyer, she has no "roof over the head" expenses.
The dissolution court ordered defendant to pay plaintiff $150 per week alimony. That order was premised, at least to some degree, on plaintiff's having to provide housing for herself. Due to her living with John Hillyer she has no housing expenses. The housing expenses she claims to have are in excess of $300 per week. At least $313 of these claimed weekly expenses are a fiction.
The court finds that plaintiff's living arrangements with John Hillyer have caused such a change of circumstances that plaintiff's financial needs have been altered considerably and should result in the termination of the alimony. CT Page 10456
The court therefore orders that plaintiff's alimony is terminated.
On May 8, 2000, this court entered an order suspending alimony pending determination of this motion.
Alimony is terminated as of May 8, 2000.
Parker, J.